2016 IL App (1st) 141040

FIFTH DIVISION
December 23, 2016

No. 1-14-1040

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 18062 |
| | ) | |
| LAMONT THOMAS, | ) | Honorable |
| | ) | Thomas M. Davy, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Reyes concurred in the judgment and opinion.

## OPINION

¶ 1    Following a bench trial, defendant Lamont Thomas was convicted of unlawful use or possession of a weapon by a felon and sentenced to five years' imprisonment. On appeal, defendant contends that the trial court erred in denying his motion to quash arrest and suppress evidence because police lacked reasonable suspicion to justify a stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). We reverse.

¶ 2                          BACKGROUND

¶ 3    Defendant was arrested on January 8, 2012, and charged by indictment with four counts of aggravated unlawful use of a weapon (AUUW) and two counts of unlawful use or possession of a weapon (UUW) based on his September 15, 2009, possession of a handgun in public. The

State charged defendant with AUUW for possessing a gun: outside of his home and the gun was uncased, loaded and immediately accessible at the time of the offense (count 1) (720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2008)); outside of his home without having been issued a valid Firearm Owner's Identification Card (FOID card) (count 2) (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2008)); within the city of Chicago (count 3) (720 ILCS 5/24-1.6(a)(2), (a)(3)(A) (West 2008)) and; within the city of Chicago without having been issued a valid FOID card (count 4) (720 ILCS 5/24-1.6(a)(2), (a)(3)(C) (West 2008)). Defendant was also charged with two counts of UUW for possessing a gun (count 5) and ammunition (count 6) after having been convicted of a felony (720 ILCS 5/24-1.1(a) (West 2008)).

¶ 4    Prior to trial, defendant filed a motion to quash arrest and suppress evidence alleging that his arrest was made in violation of the fourth and fourteenth amendments of the United States Constitution. See U.S. Const., amends. IV, XIV. At the hearing on defendant's motion, the State presented the testimony of the two police officers involved in defendant's *Terry* stop. The officers' accounts of the events leading to the stop, including their testimony regarding the contents of a tip they received from an unidentified citizen that prompted them to stop defendant, were substantially consistent and found to be credible by the trial court. Defendant does not contest the substance of the officers' testimony on appeal. The following account of the *Terry* stop, and the events leading to it, was presented at the hearing on defendant's motion to quash arrest and suppress evidence.

¶ 5    Chicago police officer Patrick Kinney testified that about 10 p.m. on September 15, 2009, he and his partner Officer Richard Antonsen, were on patrol in plain clothes and an unmarked police vehicle within the Fourth District when they were flagged down by a man with whom neither officer was familiar. Officer Kinney testified that he did not ascertain the man's name

and that the man indicated to the officers that he wished to remain anonymous. Officer Kinney described the man as a "male black approximately in his 30s." Officer Kinney testified the man did not smell of alcohol and his demeanor was "normal." During their approximately 30-second conversation, the man told Officer Kinney that "a male black wearing a red shirt had just placed a black handgun into a backpack and was *** walking eastbound on 80th Place from Exchange [Avenue]." Officer Kinney did not ask the man how he knew about the person with the gun.

¶ 6    After speaking with the unidentified man, Officer Kinney, "within seconds," relocated to 80th Place which was approximately a block and a half away. At the 2900 block of East 80th Place, Officer Kinney observed four or five people in the area, including defendant, who was wearing a red shirt, holding a backpack to the right side of his body and walking eastbound on the sidewalk. Officers Kinney and Antonsen approached defendant for a field interview. As they did so, Officer Kinney announced his office and defendant walked up the stairs leading to the front porch of a residence. Officer Kinney followed defendant to the porch and attempted to do a protective pat down of defendant's person. Officer Kinney testified that he wanted to do a protective pat down of defendant because of the information that was relayed to him that defendant was in possession of a weapon.

¶ 7    As Officer Kinney reached for defendant's waistband, defendant dropped the backpack he was holding onto the porch. Officer Kinney testified that he had not started to pat down defendant, before defendant dropped the backpack. The officer acknowledged that he prepared an arrest report, detailing the events that happened on the porch, and admitted that in the report he stated that he conducted a pat down of defendant's person and that defendant dropped the backpack while he was conducting the pat down. Officer Kinney testified that during the pat down he intended to search defendant's person and not the backpack.

¶ 8     Officer Kinney stated that when the backpack hit the porch it made a "thud" sound that was consistent with a steel object, such as a gun, inside the backpack. Officer Kinney also stated that the thud was a sound he has heard before based on "people dropping guns" in his presence. As the officer picked up the backpack, defendant grabbed it and they started to struggle over it. Officer Kinney gained possession of the backpack and threw it to his partner, who was standing below the porch near the sidewalk. As Officer Kinney attempted to detain defendant, he heard Officer Antonsen say "gun."

¶ 9     Officer Antonsen testified to substantially the same sequence of events as Officer Kinney. Officer Antonsen added that he observed defendant walking eastbound on 80th Place within minutes, "if not sooner," of speaking with the unidentified man. After Officer Kinney announced his office to defendant, the officer told defendant he was going to search him. Officer Kinney did not say anything to defendant between announcing his office and informing defendant that he was going to search him. Officer Antonsen stated that the porch defendant was standing on was made of concrete and that it was a "landing" in front of a door with enough space for three people to stand. Defendant dropped the backpack as Officer Kinney approached him. When defendant did so, Officer Antonsen heard a "metal sound" like "something hard hitting the ground." Officer Antonsen stated that he was familiar with guns, had recovered hundreds of guns, was on "the specialized unit for guns," and that the sound he heard when defendant dropped the backpack was consistent with a gun being inside the backpack. After Officer Kinney gained possession of the backpack, he threw it to Officer Antonsen, who placed the backpack on the ground, opened it and saw a handgun inside. Officer Antonsen said "gun" upon seeing the weapon in the backpack.

¶ 10    Following argument, the trial court denied defendant's motion to quash arrest and suppress evidence. In doing so, the court stated that "this is a close case" and found that, based on the short period of time within which the officers observed defendant and corroborated the unidentified man's tip, which predicted defendant's behavior, a pat down of defendant and a search of his backpack would have been justified even if defendant did not drop the backpack. In reaching this conclusion, the court stated that it believed the sequence of events as documented in Officer Kinney's arrest report that the officer was beginning to pat down defendant when defendant dropped the backpack.

¶ 11    Defendant filed a motion to reconsider the denial of his motion to quash arrest and suppress evidence. During the hearing on his motion, defense counsel argued that there was a search performed in this case and that the officers did not have probable cause to perform the search before or after defendant dropped the backpack. Counsel also pointed out to the court that the porch in question was made of wood, not concrete as testified to by Officer Antonsen, and that this contradicts the officer's testimony that he heard a "metal sound" when defendant dropped the backpack. In denying defendant's motion to reconsider, the court stated that police were justified in making a *Terry* stop based on the unidentified man's tip, which was predictive and the contents of which would not have been available to anyone. With regard to the porch being made of wood, the court stated that it was not of such significance that it would have changed the court's ruling on defendant's motion to suppress in light of Officer Kinney's testimony that the backpack made a "thud" sound when defendant dropped it and that it would have made that sound on any surface.

¶ 12    At trial, Officer Kinney testified consistent with his testimony at the hearing on defendant's motion to suppress. Officer Kinney added that the unidentified man told the officers

that he had observed a man place a handgun into a bag and directed the officers in the direction of the man. The unidentified man described the perpetrator as a black male, wearing a red shirt and holding a backpack. Officer Kinney denied that he patted down defendant before defendant dropped the backpack, but acknowledged that in the arrest report he indicated that defendant dropped the backpack during the pat down. After speaking with Officer Antonsen, Officer Kinney learned that the gun in the backpack was a revolver loaded with six live rounds. Officer Kinney also added that, as he tried to place defendant in custody, defendant fled through the house and was not apprehended on the night in question.

¶ 13    Officer Antonsen testified consistent with his testimony at the hearing on defendant's motion to suppress. He added that, along with the gun, there was also an "application" bearing defendant's name inside the backpack. After recovering the gun, Officer Antonsen yelled "gun" and released the ammunition from the cylinder of the gun. Officer Antonsen testified that defendant was not arrested on the night in question, but that he encountered defendant on September 21, 2011, and, after learning about an investigative alert for defendant, placed him in custody.

¶ 14    The State introduced into evidence a certified copy of defendant's 2006 conviction for aggravated driving under the influence and then rested.

¶ 15    Samuel Moore, defendant's friend, testified that at the time of defendant's trial he was in custody of the Illinois Department of Corrections. Moore stated that he and his cousin, Joshua Jenkins, were walking towards defendant's house when, about 15 feet away from the house, two officers stopped them and patted them down. The officers told Moore and Jenkins to leave the area and asked defendant to come down from the porch of his house. The officers then

approached defendant, who was standing on the porch, and the officers and defendant started arguing.

¶ 16    The trial court found defendant guilty of two counts of unlawful use or possession of a weapon by a felon based on his possession of the firearm and ammunition. The court sentenced defendant to five years' imprisonment on the firearm count. In doing so, the court noted that there was a finding of guilty on both counts and, without objection from either party, stated that a sentence will be entered on the firearm count. Defendant appeals.

¶ 17                                    ANALYSIS

¶ 18    Before addressing defendant's argument on appeal, we note that on September 12, 2013, before the conclusion of defendant's trial and nearly four years to the day of the *Terry* stop in question, our supreme court issued its decision in *People v. Aguilar*, 2013 IL 112116. The *Aguilar* court held that a portion of the Illinois aggravated unlawful use of a weapon statute, which operated as an absolute ban on an individual's right to possess a handgun for self-defense outside the home, was facially unconstitutional under the second amendment of the United States Constitution (U.S. Const., amend. II) and, thus, void *ab initio*. *Aguilar*, 2013 IL 112116, ¶¶ 19-21; *People v. Blair*, 2013 IL 114122, ¶ 28 (the effect of finding a statute facially unconstitutional is to render it "void *ab initio*" and therefore incapable of being enforced). Following *Aguilar*, our supreme court has reaffirmed its central holding of the statute's facial unconstitutionality in two unanimous opinions. See *People v. Mosley*, 2015 IL 115872, ¶ 24; and *In re Jordan G.*, 2015 IL 116834, ¶ 7.

¶ 19    On appeal, defendant contends, without reference to *Aguilar*, that the trial court erred in denying his motion to quash arrest and suppress evidence because police lacked reasonable suspicion to justify a *Terry* stop based on an uncorroborated tip that a black male in a red shirt

placed a gun in a backpack and was walking East on 80th Place. Defendant claims that because the officers failed to ascertain the reliability of the anonymous tip before acting on it, they lacked the reasonable suspicion necessary to justify the *Terry* stop. Defendant thus maintains that the recovered gun must be suppressed as a fruit of an illegal stop and that this court should outright reverse his conviction.

¶ 20     Review of a trial court's ruling on a motion to suppress follows a two-part standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Under this standard, a reviewing court will review the trial court's findings of fact for clear error while giving due weight to any inferences drawn from those facts by the fact finder. *Id*. As such, the factual findings made by the court in connection with a motion to suppress will not be disturbed on appeal unless they are against the manifest weight of the evidence. *Id*. A reviewing court, however, is free to undertake its own assessment of the facts in relation to the issues presented and draw its own conclusions in deciding what relief, if any, should be granted. *Id*. In doing so, a reviewing court may look to trial testimony as well as the evidence presented at the hearing on the motion to suppress. *People v. Hopkins*, 235 Ill. 2d 453, 473 (2009), citing *People v. Stewart*, 104 Ill. 2d 463, 480 (1984). We review *de novo* the trial court's ultimate legal ruling of whether the arrest should be quashed and the evidence suppressed. *Luedemann*, 222 Ill. 2d at 542.

¶ 21     The United States and Illinois Constitutions guarantee citizens the right against unreasonable searches and seizures. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6. "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 12. However, our supreme court has recognized three types of police-citizen encounters that do not constitute an unreasonable seizure. *Luedemann*, 222 Ill. 2d at 544. These encounters are: (1) arrests, which

must be supported by probable cause; (2) a brief investigative stop, also known as a *Terry* stop; and (3) encounters that do not involve coercion or detention and therefore do not implicate fourth amendment interests. *Luedemann*, 222 Ill. 2d at 544.

¶ 22    The encounter relevant to the case at bar is a *Terry* stop. In *Terry v. Ohio*, 392 U.S. at 27, the United States Supreme Court held that "an officer may, within the parameters of the fourth amendment, conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity, and such suspicion amounts to more than a mere 'hunch.' " During a *Terry* stop, an officer may temporarily detain an individual for questioning where the officer reasonably believes the individual has committed, or is about to commit, a crime. *Terry*, 392 U.S. at 21-22; *Sanders*, 2013 IL App (1st) 102696, ¶ 13.

¶ 23    To justify a *Terry* stop, officers must be able to point to specific and articulable facts which, considered with the rational inferences from those facts, make the intrusion reasonable. *Sanders*, 2013 IL App (1st) 102696, ¶ 14; *People v. Rhinehart*, 2011 IL App (1st) 100683, ¶ 14. Although reasonable suspicion is a less stringent standard than probable cause, an officer's hunch or unparticularized suspicion is insufficient. *People v. Lampitok*, 207 Ill. 2d 231, 255 (2003). When determining whether an investigatory stop is reasonable, we rely on an objective standard and view the facts from the perspective of a reasonable officer at the time of the stop. *Sanders*, 2013 IL App (1st) 102696, ¶ 14. A decision to make a *Terry* stop is a practical one based on the totality of the circumstances. *Id.*

¶ 24    A *Terry* stop may be initiated based on information received from a member of the public. *Sanders*, 2013 IL App (1st) 102696, ¶ 15. Generally, a tip from a "concerned citizen" is considered more credible than information from a paid informant or a person who provided the tip for personal gain. *Id.* A tip from an anonymous person may be sufficient to justify a *Terry*

stop provided the information bears some indicia of reliability. *People v. Henderson*, 2013 IL 114040, ¶ 26. If an unidentified person places their anonymity at risk by speaking to officers in person we may consider this fact when weighing the reliability of the tip. *Sanders*, 2013 IL App (1st) 102696, ¶ 26. The tip must be " 'reliable in its assertion of illegality, not just in its tendency to identify a determinate person.' " *Id.*, quoting *Florida v. J.L.*, 529 U.S. 266, 272 (2000).

¶ 25    In this court, both parties focus on the reliability of the tip received by the officers. Defendant argues that the tip was not sufficiently reliable to provide the officers with a reasonable suspicion of criminal activity to justify a *Terry* stop, while the State argues that it was reliable. Neither party addresses the impact of the holding in *Aguilar* on the case at bar, and this issue was not raised in the trial court. In denying defendant's motion to suppress and his motion to reconsider, the court stated that the tip from the unidentified man was sufficient to justify a *Terry* stop because its contents were not available to anyone, it was predictive in nature, and the officers corroborated the tip in a short period of time. We begin our analysis by first, briefly addressing the reliability of the tip received by the officers.

¶ 26    Here, we agree with the trial court that, based on the evidence presented, the tip was sufficiently reliable to justify a *Terry* stop. The record shows that the unidentified man in this case approached Officers Kinney and Antonsen in person and engaged in a face-to-face conversation with the officers. In doing so, the man risked his anonymity and the chance that the officers might identify him in the future. As such, the unidentified man in this case has a greater resemblance to a citizen informant than an anonymous one. See *Sanders*, 2013 IL App (1st) 102696, ¶ 31. Moreover, the face-to-face conversation allowed Officer Kinney to observe the man's demeanor and determine the man's credibility as he gave the tip to the officer. See *Id.* Officer Kinney testified that the man did not smell of alcohol and that his demeanor was

"normal." Apparently, Officer Kinney found the man credible because the officer "within seconds" relocated to the area where the man said defendant would be walking eastbound.

¶ 27    During his conversation with the officers, the man explained the basis of his knowledge, and accurately described defendant's appearance and defendant's direction of travel. Officer Kinney testified at trial that the unidentified man told the officers that he had observed a man place a handgun into a bag and that the man was a black male, wearing a red shirt and holding a backpack. The officers corroborated the tip "within seconds" because the distance between the tip and the *Terry* stop was a "block and half." Moreover, the tip in this case did provide some predictive information through which the officers were able to corroborate the tip *i.e.* that defendant would be walking eastbound on 80th Place. See *Sanders*, 2013 IL App (1st) 102696, ¶ 25 (tip was sufficient to justify a *Terry* stop where the informant spoke to the officer in person, explained the basis of his knowledge, and accurately described defendant's direction of travel). This information, under the totality of the circumstances, was sufficiently reliable to allow Officer Kinney to initiate a *Terry* stop. See *Sanders*, 2013 IL App (1st) 102696, ¶ 31.

¶ 28    However, our analysis cannot end here. Rather, the *Terry* stop in this case is valid only if the contents of the tip, specifically, defendant's possession of the handgun, provided the officers with reasonable suspicion of criminal activity. There is no question that on September 15, 2009, the date of the *Terry* stop, Illinois law completely prohibited the possession of a handgun in public, if the gun was uncased, loaded, and immediately accessible at the time of the offense. See 720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2008). As such, given that defendant's reported conduct was illegal at the time, and that the tip was sufficiently reliable, the officers could reasonably suspect that defendant was involved in criminal activity and were justified in initiating a *Terry* stop.

- 11 -

¶ 29   That said, following defendant's *Terry* stop, that portion of the Illinois aggravated unlawful use of a weapon statute, which banned the possession of a handgun in public and formed the basis of the officers' reasonable suspicion of criminal activity to justify the *Terry* stop, was held to be facially unconstitutional by *Aguilar* and void *ab initio*. See *Aguilar*, 2013 IL 112116, ¶¶ 19-21. Therefore, while we agree that when the officers initiated the *Terry* stop they had reason to believe that defendant was in violation of a law that was valid at the time, we must nevertheless consider the significance of the fact that the statute has since been declared unconstitutional if we are to resolve the ultimate question of whether defendant's constitutional rights were violated.

¶ 30   Post-*Aguilar,* a tip, such as the one here, that merely mentions a gun in defendant's possession is not sufficient, without any more information regarding defendant's criminal conduct, to provide officers with reasonable suspicion of criminal activity to justify a *Terry* stop. Stated differently, the portion of the AUUW statute that justified the *Terry* stop at the time is no longer valid and, thus, would not justify such a stop today because the reported conduct is no longer criminal.

¶ 31   We have reviewed the record and have found no other basis for reasonable suspicion of criminal activity to justify defendant's *Terry* stop. The record shows that the officers were not familiar with defendant prior to receiving the tip that he was in possession of a handgun. The tip did not contain any information that defendant was involved in other criminal activity or whether he had been issued a FOID card. Although defendant was later charged, in part, with violating the FOID-card portion of the AUUW statute, this does not mean that the officers, at the time they received the tip, had enough information for a reasonable suspicion of criminal activity to justify a *Terry* stop. Moreover, the officers did not testify that they observed defendant committing a

crime or that they had reason to believe that defendant was connected with any other crime independent of his possession of the gun. As such, even after receiving the tip, the officers did not have enough information for a reasonable suspicion of criminal activity that would justify a *Terry* stop today. Therefore, a constitutional violation occurred in this case, and although it was not considered a constitutional violation at the time, we cannot, post-*Aguilar*, find otherwise. Accordingly, we conclude that the *Terry* stop in this case constituted an unreasonable seizure and violated defendant's constitutional rights.

¶ 32     Having so found, we next address whether the gun recovered as a result of the *Terry* stop should be suppressed. When evidence is obtained in violation of the fourth amendment, the exclusionary rule precludes the use of such evidence against a defendant in a criminal proceeding. *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), citing *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The purpose of the exclusionary rule is not to provide a constitutional right to an aggrieved party but, rather, to act as a deterrent against improper conduct by government agents. *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), citing *Calandra*, 414 U.S. at 348.

¶ 33     Given this purpose, the United States Supreme Court has created a "good-faith exception" to the exclusionary rule, which allows the use of evidence where an officer is "acting as a reasonable officer would and should act in similar circumstances" albeit on a subsequently invalidated search warrant. *Leon*, 468 U.S. at 919-20. In *Illinois v. Krull*, the Supreme Court extended the good-faith exception to encompass a situation where an officer acts in objectively reasonable reliance on a statute authorizing warrantless administrative searches, despite the statute ultimately being found to violate the fourth amendment. *Illinois v. Krull*, 480 U.S. 340,

349-50, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). The Supreme Court has also ruled that the exclusionary rule does not necessarily bar evidence obtained by police in a search based on a violation of a law later invalidated as unconstitutional. See *Michigan v. DeFillippo*, 443 U.S. 31, 38-9, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979).

¶ 34      However, in *People v. Krueger*, 175 Ill. 2d 60, 61 (1996), our supreme court declined to adopt the *Krull* good-faith exception after finding that the Illinois Constitution barred its application. Specifically, the *Krueger* court held that evidence obtained pursuant to a "no-knock" statute, which it found violated the defendant's fourth amendment rights, may not be admitted at trial under the good-faith exception to the exclusionary rule. *Id.* at 62-63, 75-76. In reaching this conclusion, the *Krueger* court stated that if it were to recognize a good-faith exception to our state exclusionary rule it would "provide a grace period for unconstitutional search and seizure legislation, during which time our citizens' prized constitutional rights can be violated with impunity." *Id.* at 75.

¶ 35      After *Krueger*, our supreme court issued its decision in *People v. Carrera*, 203 Ill. 2d 1, 16-17 (2002), in which it refused to apply the good-faith exception to the exclusionary rule based on the void *ab initio* doctrine and its concern that, to do otherwise, would create a "grace period" for unconstitutional search and seizure. In *Carrera*, Chicago police officers arrested the defendant outside of the city of Chicago pursuant to an extraterritorial jurisdiction arrest statute that was later declared unconstitutional and void *ab initio*. *Id.* at 3, 8, 16. The defendant filed a motion to quash his arrest and suppress evidence, arguing the officers lacked authority to arrest him outside of Chicago. *Id.* at 7. The circuit court denied the motion. *Id.* On appeal, this court reversed the circuit court's order and remanded for further proceedings. *Id.* at 9-10. The State appealed, arguing, in relevant part, that the good-faith exception to the exclusionary rule should

apply because the officers did not violate the defendant's substantive constitutional rights when effectuating the extraterritorial arrest. *Id.* at 13. The *Carrera* court acknowledged the State's argument, but elected to resolve the case "on narrow grounds," finding that the void *ab initio* doctrine dictated the conclusion it reached. *Id.* at 13-14.

¶ 36 In doing so, our supreme court in *Carrera* explained that a statute which is facially unconstitutional is void *ab initio* and confers no right, imposes no duty and affords no protection. *Id.* at 14. "It is as though no such law had ever been passed." *Id.* As such, the *Carrera* court refused to apply the good-faith exception to the defendant's case, reasoning that to do so "would run counter to *** void *ab initio* jurisprudence—specifically, that once a statute is declared facially unconstitutional, it is as if it had never been enacted." *Id.* at 16. Echoing the *Krueger* court's concern with a "grace period for unconstitutional search and seizure," the *Carrera* court explained that to give legal effect to the historical fact that the amendment existed when the defendant was arrested "would effectively resurrect the amendment and provide a grace period *** during which our citizens would have been subject to extraterritorial arrests without proper authorization." *Id.* The Carrera court declined to recognize such a grace period and held that an arrest executed pursuant to a statute that is later found to be unconstitutional is unlawful, and evidence seized as a result of that arrest is subject to the exclusionary rule. *Id.* at 16-17.

¶ 37 Here, while we recognize that defendant was the subject of a *Terry* stop, rather than an arrest, we nevertheless find *Carrera* instructive and, based on the language therein, conclude that the void *ab initio* doctrine precludes the application of the good-faith exception to the exclusionary rule. As in *Carrera*, we decline to apply the good-faith exception in the present case and thereby recognize the historical fact that the now invalidated portion of the AUUW statute existed at the time of defendant's *Terry* stop. Were we to do so, we too would effectively

be resurrecting that portion of the AUUW statute and providing a grace period during which individuals would have continued to be subject to *Terry* stops for violating that portion of the statute that was invalidated by *Aguilar*. *People v. Holmes*, 2015 IL App (1st) 141256, ¶ 30, *appeal allowed* No. 120407 (2016). Accordingly, we hold that defendant's *Terry* stop, initiated on the basis of reasonable suspicion of criminal activity pursuant to the now invalidated portion of the AUUW statute, is unlawful and evidence seized as a result of the stop is subject to the exclusionary rule.

¶ 38    In support of this conclusion, we note that this court, in *Holmes*, recently addressed a similar issue and, based on the language in *Carrera*, reached a similar conclusion. *Holmes*, 2015 IL App (1st), ¶ 30. In *Holmes*, the defendant was arrested when a police officer observed a revolver in his waistband. *Id.* ¶ 1. After placing the defendant under arrest, the officer discovered that he did not have a valid FOID card. *Id.* The defendant was subsequently charged with two counts of AUUW for carrying an uncased, loaded, and immediately accessible firearm, and two counts of AUUW for carrying a firearm without a valid FOID card. *Id.* ¶ 5. Given our supreme court's decision in *Aguilar*, the State conceded that the two counts of AUUW based on the defendant's possession of an uncased, loaded, and immediately accessible firearm should be dismissed and entered a *nolle prosequi* on those counts. *Id.*

¶ 39    The defendant then filed a motion to quash his arrest and suppress evidence with respect to the two remaining AUUW counts, arguing that his arrest was unconstitutional because police lacked probable cause to believe that he was committing a crime. *Id.* ¶ 6. The defendant noted the decision in *Aguilar* and asserted that the good-faith exception to the exclusionary rule did not apply because police were enforcing an unconstitutional statute. *Id.* In support of this assertion, the defendant relied on *Carrera*. *Id.* The circuit court granted the defendant's motion, finding

that the officer lacked probable cause because he did not know whether the defendant had a valid FOID card and was investigating the defendant for violating a law later found to be unconstitutional and void *ab initio*. *Id.* ¶ 9. In so doing, the circuit court noted that if a statute is void *ab initio*, it is as if it never existed and thus cannot give rise to probable cause. *Id.*

¶ 40    The State appealed, arguing that *Carrera* was distinguishable and that the circuit court should have recognized a good-faith exception to the exclusionary rule because the officer was operating under the law valid at the time of the defendant's arrest and, thus, the defendant's fourth amendment rights were not violated. *Id.* ¶ 13. This court affirmed, relying on the language in *Carrera* concerning the void *ab initio* doctrine. *Id.* ¶ 36-38. Specifically, this court in *Holmes* found that the same concern with a "grace period" was implicated on the facts of the case before it, where individuals would have continued to be subject to arrests for violating the portion of the AUUW statute that was invalidated in *Aguilar*. *Id.*, ¶ 30. We see no reason to depart from the reasoning in *Carrera* and *Holmes*.

¶ 41    We briefly note that in *Holmes*, this court pointed out that, in granting the defendant's motion to suppress, the trial court stated that the defendant's case was "kind of unfortunate because the officer didn't do anything wrong at the time" and the officer could have effectuated a valid *Terry* stop and inquired right away whether the defendant had a FOID card. Id. ¶ 9. This statement, made without reference to legal authority, implies that had the defendant answered in the negative the officers could have effectuated a lawful arrest. Here, as mentioned, and as in *Holmes*, the officers did not do anything wrong at the time of the *Terry* stop. However, as in *Holmes*, the officers also did not inquire whether defendant had a FOID card and instead proceeded to pat him down. While at the time, the officers were justified in doing so under the then effective portion of the AUUW statute, that portion of the statute has since been declared

void *ab initio*—"as if it had never been enacted"—and thus, having never been enacted, cannot give rise to reasonable suspicion of criminal activity for defendant's *Terry* stop. Given the officers' lack of reasonable suspicion, defendant's *Terry* stop and seizure of the gun were unconstitutional.

¶ 42                                    CONCLUSION

¶ 43    For the reasons stated, we reverse the order of the trial court denying defendant's motion to quash arrest and suppress evidence.

¶ 44    Reversed and remanded.

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

LAMONT THOMAS,

Defendant-Appellant.

No. 1-14-1040

Appellate Court of Illinois
First District, FIFTH DIVISION

December 23, 2016

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.

Presiding Justice Gordon and Justice Reyes concurred in the judgment and opinion.

Appeal from the Circuit Court of Cook County.
The Hon. Thomas M. Davy, Judge Presiding.

**COUNSEL FOR APPELLANT**
Michael J. Pelletier, State Appellate Defender, Chicago, IL 60601
Patricia Mysza, Deputy Defender
OF COUNSEL: Benjamin A. Wolowski

**COUNSEL FOR APPELLEE**
Kimberly M. Foxx, Cook County State's Attorney, Chicago, IL 60602
OF COUNSEL: Alan Spellberg, John E. Nowak and Jessica R. Ball