2019 IL App (1st) 161104

FIRST DISTRICT
SECOND DIVISION
July 25, 2019

1-16-1104

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 15164 |
| | ) | |
| JAMAL JOHNSON, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MASON delivered the judgment of the court, with opinion.
Presiding Justice Lavin concurred in the judgment and opinion.
Justice Hyman dissented, with opinion.

**OPINION**

¶ 1 Following a bench trial, defendant, Jamal Johnson, was convicted of one count of aggravated unlawful use of a weapon and sentenced to 13 months' imprisonment. On appeal, he argues that (1) the trial court erred in denying his motion to quash arrest and suppress evidence because police officers conducted an unreasonable stop and search in violation of *Terry v. Ohio*, 392 U.S. 1 (1968), (2) his right of confrontation was violated when the State used a certified document to show he did not have a Firearm Owner's Identification (FOID) card, and (3) his fines and fees order failed to offset certain charges with presentence credit. We affirm and remand the fines and fees issues to the trial court pursuant to Illinois Supreme Court Rule 472 (eff. Mar. 1, 2019).

¶ 2    Johnson was charged by indictment with eight counts of aggravated unlawful use of a weapon arising from an incident in Chicago on September 1, 2015. The State nol-prossed all counts except one, which alleged aggravated unlawful use of a weapon predicated on Johnson's failure to possess a FOID card (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2014)). Before trial, Johnson filed a motion to quash arrest and suppress evidence, arguing that his arrest was an unreasonable seizure in violation of the fourth amendment of the United States Constitution (U.S. Const., amend. IV) and that the evidence discovered as a result of his arrest and detention should be suppressed. The trial court heard Johnson's motion simultaneously with the trial.

¶ 3    On September 1, 2015, at about 12:55 a.m., Chicago police officer Richard Salvador was working with three other officers in an unmarked vehicle in "an area known for high narcotic and gang activity." As they drove eastbound down an alley north of 69th Street between Paulina Street and Hermitage Avenue, Salvador observed Johnson standing in the middle of the alley. Johnson turned toward the officers, saw them, and then "grabbed onto the front of his waistband and continued walking briskly eastbound as if to avoid" them. According to Salvador, this gesture is common "for people who are trying to hold onto and conceal a weapon." The officers drove further eastbound "in an attempt to perform a [street] stop on the defendant" with another squad car "exactly behind" them. Once the officers exited their vehicles, Johnson turned and ran westbound toward the squad car. The officers chased him, and he held "onto his waistband to secure an object" and jumped onto the squad's hood. After the officers "observed [defendant] standing on the hood of the squad car with no way to make good his escape," Salvador "conducted a protective pat-down." In the front portion of Johnson's waistband, Salvador felt a "large hard object resembling a firearm," and he recovered a loaded semiautomatic handgun. An officer delivered *Miranda* warnings, and Johnson said, "I carry [the gun] for protection because

I've gotten shot before." The officers transported him to a police station, and Salvador inventoried the gun. Salvador did not memorialize Johnson's statement.

¶ 4     The State entered into evidence an Illinois State Police certification, which stated:

> "Based on the following name and date of birth information provided by the Cook County State's Attorney's Office, I, Executive I Tracey Schultz, Firearms Service Bureau (FSB), Illinois State Police, do hereby certify, after a careful search of the FSB files, the information below to be true and accurate for Jamal D. Johnson whose date of birth is August 5, 1995, has never been issued a FOID or CCL Card as of October 7, 2015."

Defense counsel did not object to admission of the certification.

¶ 5     The State rested, and the trial court denied Johnson's motion for directed finding. Johnson rested without presenting any evidence.

¶ 6     In support of Johnson's motion to quash arrest and suppress evidence, defense counsel argued that the police officers did not have a sufficient basis to subject Johnson to a *Terry* stop and pat down since "all he was doing was standing in an alley and touching his waistband." She further asserted that the fact that Johnson ran away was not a sufficient basis to conduct a *Terry* stop. The assistant state's attorney argued that Johnson was not detained until after he jumped onto the squad car. She further noted that Johnson was seen in a "high crime area," and that he "grabbed his waistband, looked in the officers' direction and took off running trying to make good his escape over another Chicago police vehicle." According to the assistant state's attorney, "[a]t that point, the officer certainly had reasonable articulable suspicion to stop the defendant."

¶ 7     Before ruling on Johnson's motion, the court heard closing arguments for the trial. Defense counsel argued that the State failed to prove Johnson guilty beyond a reasonable doubt because it presented the testimony of only one officer, who did not memorialize Johnson's

statement. Defense counsel neither mentioned the Illinois State Police certification nor raised whether the State proved that Johnson lacked a valid FOID card. The State responded that Salvador "testified clearly and credibly" and "there was no impeachment of his testimony." Based on Salvador's testimony, as well as the Illinois State Police certification, the State argued there was sufficient evidence to find Johnson guilty of aggravated unlawful use of a weapon.

¶ 8    The trial court denied Johnson's motion to quash arrest and suppress evidence and found him guilty of aggravated unlawful use of a weapon. The court recognized that Johnson "ha[d] a right to be in the alley." Nonetheless, it also observed Johnson was in a "high crime area" and "made a motion towards his waistband," which Salvador believed indicated that Johnson was armed. The trial court found that Johnson was not detained until after he ran and jumped onto the hood of a police car, at which point the officers had "articulable suspicion to *** detain Mr. Johnson" and "pat him down."

¶ 9    Johnson filed a motion to reconsider the trial court's denial of his motion to quash and suppress, as well as a motion for new trial. Defense counsel argued that it was "completely legitimate" for Johnson to stand in the alley and hold his waistband. Thus, the police officers did not have a basis to stop and pat down Johnson, regardless of whether he ran from them and jumped on a police car, since they did not have a reason to approach him in the first place. Defense counsel also generally argued that the State did not prove Johnson's guilt beyond a reasonable doubt but did not raise whether the State failed to prove he lacked a valid FOID card.

¶ 10    The trial court denied Johnson's motions, sentenced him to 13 months' imprisonment, and denied his motion to reconsider sentence. Johnson received 199 days of presentence credit and was charged $719 in fines and fees.

¶ 11    On appeal, Johnson first argues that the trial court erred in denying his motion to suppress because the police officers lacked a reasonable, articulable suspicion to conduct the *Terry* stop that produced the gun and statement that were admitted at trial. According to Johnson, there was no basis for the police officers to suspect that he was involved in criminal activity since his actions in the alley did not appear unlawful. The State responds that after Johnson held his waistband, ran from the police, and jumped onto the squad car's hood, a *Terry* stop and protective pat down were justified.

¶ 12    When reviewing a trial court's ruling on a motion to suppress, we accord deference to the trial court's factual determinations and will only reverse when those findings are against the manifest weight of the evidence. *People v. Close*, 238 Ill. 2d 497, 504 (2010). This standard is "grounded in the reality that the trial court is in a superior position to determine and weigh the credibility of witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony." *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). However, we "review *de novo* the court's ultimate decision to grant or deny the motion." *Close*, 238 Ill. 2d at 504. When affirming the trial court's denial of a motion to suppress, the reviewing court may consider evidence presented both at trial and at the suppression hearing. *People v. Caballero*, 102 Ill. 2d 23, 34-36 (1984); *People v. Lawson*, 2015 IL App (1st) 120751, ¶ 28.

¶ 13    The fourth amendment of the United States Constitution and the Illinois Constitution of 1970 both "guarantee the right of individuals to be free from unreasonable searches and seizures." *People v. Colyar*, 2013 IL 111835, ¶ 31; U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Flowers*, 179 Ill. 2d 257, 262 (1997). But "a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the

person has committed, or is about to, commit a crime." *Close*, 238 Ill. 2d at 505 (citing *Terry*, 392 U.S. at 22). Additionally, "when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others, the officer may conduct a pat-down search to determine whether the person is in fact carrying a weapon." *Sorenson*, 196 Ill. 2d at 432 (citing *Terry*, 392 U.S. at 24). "Whether an investigatory stop is valid is a separate question from whether a search for weapons is valid." *Flowers*, 179 Ill. 2d at 263. Because Johnson challenges the validity of both his stop and his search, we will consider these two issues separately.

¶ 14    As an initial matter, we must determine the point at which Johnson was seized, since the fourth amendment is not implicated until a "seizure" occurs. *People v. Thomas*, 198 Ill. 2d 103, 110-11 (2001). "[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). In other words, a seizure occurs "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554. The parties agree, correctly, that Johnson was seized when, while he was on top of the squad car, he allowed Officer Salvador to conduct a pat-down. See *id.* (providing examples of circumstances that might indicate a seizure, including "some physical touching of the person of the citizen"). Having determined the point at which Johnson was seized, we consider whether, at that point, the police officers properly stopped him under the principles set forth in *Terry*.

¶ 15    A *Terry* stop must be justified at its inception, and "[v]iewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would be expected to act quickly." *Thomas*, 198 Ill. 2d at 110. " '[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together

with rational inferences from those facts, reasonably warrant that intrusion.' " *People v. Galvin*, 127 Ill. 2d 153, 163 (1989) (quoting *Terry*, 392 U.S. at 21). "The officer's suspicion must amount to more than an inarticulate hunch [citations], but need not rise to the level of suspicion required for probable cause [citation]." *Close*, 238 Ill. 2d at 505. "Unprovoked flight in the face of a potential encounter with police may raise enough suspicion to justify the ensuing pursuit and investigatory stop." *Thomas*, 198 Ill. 2d at 113. When determining the validity of a stop, we must consider the totality of the circumstances. *People v. Timmsen*, 2016 IL 118181, ¶ 9.

¶ 16    The evidence summarized above—Johnson's late-night presence in a high-crime area, his retreat upon seeing the officers, and his conduct in holding his waistband and ultimately jumping onto the hood of the police vehicle—all give rise to a reasonable articulable suspicion of criminal activity. In particular, Johnson's leap onto the hood of a police car was, to say the least, an unusual act, which suggested aggression and potential danger to the officers or others, regardless of the neighborhood in which it occurred. See *People v. Jackson*, 2012 IL App (1st) 103300, ¶¶ 17, 49 (stating that "unusual conduct" can lead an officer to reasonably "conclude *** that criminal activity may be afoot," and finding the defendant's bizarre and "erratic" behavior justified a *Terry* stop (internal quotation marks omitted)). This conduct, along with the other evidence, supported a finding of reasonable suspicion that defendant was committing, or was about to commit, a crime. See *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000) (finding the police officer had a reasonable suspicion that the defendant was involved in criminal activity, where the defendant was seen in "an area of heavy narcotics trafficking" and ran from the police without provocation). Accordingly, the officers were justified in conducting a *Terry* stop once Johnson leapt onto the squad car.

¶ 17    Johnson asserts that his actions leading up to the stop were lawful, and that carrying a concealed weapon is not *per se* unlawful. However, our supreme court has recognized that "innocent behavior frequently provides the necessary reasonable suspicion for a *Terry* stop." *Timmsen*, 2016 IL 118181, ¶ 44 ("Where possibly innocent conduct also suggests criminal activity, *** an investigative stop is justified to resolve the ambiguity."). Further, the United States Supreme Court has acknowledged that "*Terry* accepts the risk that officers may stop innocent people." *Wardlow*, 528 U.S. at 126. That said, Johnson's actions, which included running and jumping onto a police car, were certainly "so far from the ordinary that any competent officer would be expected to act quickly" (*Thomas*, 198 Ill. 2d at 110), and supported a reasonable suspicion that Johnson was involved in criminal activity (*Close*, 238 Ill. 2d at 505).

¶ 18    The dissent cites *People v. Thomas*, 2016 IL App (1st) 141040, ¶ 31, for the proposition that "we have held that officers lacked reasonable suspicion to support a *Terry* stop where the basis for the stop rests entirely on suspicion of simple gun possession." *Infra* ¶ 47. This citation is improper. The judgment in *Thomas* was vacated pursuant to a supervisory order, *People v. Thomas*, No. 121947 (Ill. Sept. 27, 2017), and on reconsideration in light of *People v. Holmes*, 2017 IL 120407, the panel reached the opposite result. *People v. Thomas*, 2018 IL App (1st) 141040-U. Furthermore, the *Terry* stop here did not rest entirely on the officers' suspicion of simple gun possession. Indeed, it would have been extraordinary for the officers to fail to perform a *Terry* frisk after Johnson, apparently armed, jumped on top of the squad car.

¶ 19    Johnson's effort to cast his conduct in an innocent light by claiming that he only jumped on the police vehicle because he "had a lot of momentum" and may not have known the individuals in the alley were police officers is a challenge the trial court's factual determinations. But, as noted, the trial court was in a better position to "determine and weigh the credibility of

witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony" (*Sorenson*, 196 Ill. 2d at 431), and we accord its factual findings deference (*Close*, 238 Ill. 2d at 504).

¶ 20    Further, given the justification for the *Terry* stop, including the suspicion that Johnson was armed, the ensuing pat down was likewise proper. The purpose of a limited search under *Terry* is "the protection of the police officer and others in the vicinity, not to gather evidence." *Sorenson*, 196 Ill. 2d at 432. When conducting a search under *Terry*, " '[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' " *Colyar*, 2013 IL 111835, ¶ 36 (quoting *Terry*, 392 U.S. at 27). The officer conducting the search "must be able to point to specific, articulable facts which, when taken together with natural inferences, reasonably warrant the intrusion." *Flowers*, 179 Ill. 2d at 264. " '[A] perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime.' " *Colyar*, 2013 IL 111835, ¶ 50 (quoting *Terry*, 392 U.S. at 26-27). Although we must apply an objective standard, "the testimony of an officer as to his subjective feelings is one of the factors which may be considered in the totality of the circumstances known to the officer at the time of the frisk." *Galvin*, 127 Ill. 2d at 168.

¶ 21    Here, the police officers had a reasonable apprehension of danger, which justified a limited search of Johnson's person for weapons. Salvador testified that he saw Johnson "grab *** onto the front of his waistband and continue *** walking briskly," a gesture common "for people who are trying to hold onto and conceal a weapon." See *People v. Richardson*, 2017 IL App (1st) 130203-B, ¶ 27 (finding an officer's "belief that the defendant was most likely hiding a

weapon," based on the defendant's hand gesture towards his waistband, "indicated a sufficient suspicion to warrant the pat-down search" (internal quotation marks omitted)). Given this evidence, as well as Johnson's actions in running from the police and jumping on top of the squad car, a reasonably prudent person would have been "warranted in the belief that his safety or that of others was in danger." (Internal quotation marks omitted.) *Colyar*, 2013 IL 111835, ¶ 36. Accordingly, because the police officers properly stopped and searched Johnson under *Terry*, we affirm the trial court's denial of Johnson's motion to quash arrest and suppress evidence.

¶ 22    Johnson next argues that his right of confrontation was violated when the State used an Illinois State Police certification to show he did not have a FOID card. The State responds that Johnson acquiesced in the certification's entry into evidence and that, because defense counsel made a strategic decision not to contest whether Johnson had a FOID card, he cannot now raise the issue on appeal.

¶ 23    Johnson acknowledges that he forfeited this issue by failing to raise it at trial and in a posttrial motion but asserts that we can consider the challenge under plain-error review or, in the alternative, as ineffective assistance of counsel. Under the plain-error doctrine, a reviewing court may address a forfeited claim where a "clear or obvious error occurred" and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Hood*, 2016 IL 118581, ¶ 18.

¶ 24    The sixth amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI; see also Ill. Const. 1970, art. I, § 8 ("In criminal prosecutions, the accused shall have the right *** to be confronted with the witnesses against him or her ***."). In light of this clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

¶ 25    The question of whether the Illinois State Police certification's admission implicated defendant's constitutional right of confrontation does not involve any disputed facts, since the State primarily asserts that defendant invited any error that occurred in the admission. Moreover, the declarant's certification and any comments about it at trial are before us, and the trial court did not have the opportunity to consider the question. Based on these factors, our review of whether Johnson's right of confrontation was violated is *de novo*. See *People v. Cox*, 2017 IL App (1st) 151536, ¶¶ 57-58. We have previously found that an Illinois State Police certification stating that a defendant lacked a FOID card is a testimonial statement pursuant to *Crawford*, and therefore, the confrontation clause is implicated. *Id.* ¶ 63; *People v. Diggins*, 2016 IL App (1st) 142088, ¶ 16.

¶ 26    In response to defendant's invocation of the plain-error doctrine, the State invokes the rule of invited error, or acquiescence, which prevents a party from "complain[ing] of error which that party induced the court to make or to which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). More specifically, "when a defendant procures, invites, or acquiesces in the admission of evidence, even though the evidence is improper, [he] cannot contest the admission on appeal." *People v. Bush*, 214 Ill. 2d 318, 332 (2005). "This is because,

by acquiescing in rather than objecting to the admission of allegedly improper evidence, a defendant deprives the State of the opportunity to cure the alleged defect." *Id.* Because invited errors are not subject to plain-error review, we must determine whether Johnson invited the alleged error at trial before considering Johnson's plain-error argument. *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 30.

¶ 27     In *Diggins*, the State produced an Illinois State Police certification stating defendant did not possess a valid FOID card, and the certification was admitted into evidence over defense counsel's objection. *Diggins*, 2016 IL App (1st) 142088, ¶¶ 6-7. Defendant testified on cross-examination that he did not possess a FOID card. *Id.* ¶ 8. Nonetheless, we found that the admission of the certification was a confrontation clause violation that warranted a new trial since the State could not have proven the defendant lacked a FOID card without the certification and the State presented no arguments that the error was harmless. *Id.* ¶¶ 17-19. In *Cox*, 2017 IL App (1st) 151536, on the other hand, we found no error in the admission of a similar Illinois State Police certification regarding a FOID card. The trial court in *Cox* gave the defense counsel three opportunities to object to the certification's admission, and the defense declined to object each time. *Id.* ¶ 26. During closing arguments, the prosecutor additionally stated that defendant's lack of a FOID card was uncontested, and the defense offered no objection. *Id.* ¶¶ 36, 74. We held that the defendant "invited the trial court to admit the certificate by affirmatively responding to the trial court's questions that it had no objection to its admission." *Id.* ¶ 76. Accordingly, *Cox* expressly distinguished *Diggins* on the ground that *Diggins* concerned evidence that the defense disputed. *Id.* ¶¶ 80-83.

¶ 28     The reasoning of *Cox* applies here. Johnson did not object to admission of the Illinois State Police certification. Although the trial court did not ask whether there was an objection to

the admission of the certification during trial, nothing prevented defense counsel from raising an objection. See *id.* ¶ 75 ("If the defense had objected at any point during trial, *** the State could have easily remedied the problem by simply calling the State employee to the stand."). Defense counsel likewise failed to object when the certification was mentioned during the State's closing argument. During closing argument, defense counsel also did not mention the certification or dispute whether the State proved beyond a reasonable doubt that Johnson lacked a FOID card. Finally, the claimed error was not raised in Johnson's posttrial motion.

¶ 29    Based on the circumstances of this case, we find that Johnson acquiesced in the entry of the Illinois State Police certification and cannot now contend that the evidence's admission was error. See *In re Detention of Swope*, 213 Ill. 2d at 217. We conclude that the admission of the certification did not violate Johnson's rights under the confrontation clause. Because invited errors are not subject to plain-error review, we need not consider whether plain error occurred. *Sanders*, 2012 IL App (1st) 102040, ¶ 30.

¶ 30    We also reject Johnson's contention that counsel was ineffective for failing to raise a confrontation clause objection to the admission of the Illinois State Police certification. To establish ineffective assistance of counsel under *Strickland*, a defendant must show that "(1) counsel's performance was objectively unreasonable compared to prevailing professional standards and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Cherry*, 2016 IL 118728, ¶ 30 (citing *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). Under the first prong, "a defendant must show that his trial attorney's performance was deficient." *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 75. "[T]he defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." (Internal

quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327 (2011). "[D]ecisions regarding what matters to object to and when to object are matters of trial strategy," and "will typically not support a claim of ineffective representation." (Internal quotation marks omitted.) *People v. Macias*, 2015 IL App (1st) 132039, ¶ 82.

¶ 31    This court has ruled that "[f]ailing to object to certain State evidence has a similar effect to stipulating to the evidence." *People v. Probst*, 344 Ill. App. 3d 378, 387 (2003) (rejecting defendant's claim of ineffective assistance where defendant raised a confrontation clause issue on appeal concerning the admission of a lab report and accompanying affidavit, but counsel failed to object to the evidence at trial). "[B]ecause a decision to stipulate to certain State evidence remains one of trial strategy within defense counsel's sound judgment ***, defense counsel's agreement to stipulate does not implicate the defendant's right under either the federal or state constitution to confront and cross-examine the witnesses against him." (Internal quotation marks omitted.) *Id.* "[D]efense counsel may waive a defendant's right of confrontation as long as the defendant does not object and the decision to stipulate is a matter of trial tactics and strategy." (Internal quotation marks omitted.) *People v. Phillips*, 217 Ill. 2d 270, 287 (2005).

¶ 32    As we previously noted in considering a similar claim of ineffective assistance in *Cox*, "the only way that defense counsel's decision not to object to the certification could possibly be ineffective assistance was if defendant actually had a FOID card and the certification was in error." (Emphasis omitted.) *Cox*, 2017 IL App (1st) 151536, ¶ 88. There is nothing in the record here that would suggest Johnson possessed a valid FOID card or that the Illinois State Police certification was in error. Further, defense counsel did not argue at trial that Johnson in fact possessed a valid FOID card, instead focusing on whether his initial stop and search was proper. Overall, the record supports the conclusion that defense counsel's decision not to object was an

intentional strategy, as testimony regarding Johnson's failure to possess a FOID card would only have emphasized the unlawfulness of his conduct. See *Phillips*, 217 Ill. 2d at 286-87 (noting that defense counsel's cross-examination of a forensic scientist on a report may not have had "any tactical advantage" for defendant where "such testimony would have been an unnecessary distraction" from the issue the defense theory was focused on). Johnson has not overcome the strong presumption that defense counsel refrained from objecting to the certification as a matter of sound trial strategy. See *Manning*, 241 Ill. 2d at 327. Accordingly, Johnson's claim of ineffective assistance fails.

¶ 33    Finally, Johnson argues that the trial court failed to offset a $10 mental health court fine (55 ILCS 5/5-1101(d-5) (West 2014)), a $5 youth diversion/peer court fine (*id.* § 5-1101(e)), a $5 drug court fine (*id.* § 5-1101(f)), a $30 Children's Advocacy Center fine (*id.* § 5-1101(f-5)), a $15 state police operations fine (705 ILCS 105/27.3a(1.5) (West 2014)), and a $50 court system fee (55 ILCS 5/5-1101(c)(1) (West 2014)) for time served in presentence custody under section 110-14(a) of the Code (725 ILCS 5/110-14(a) (West 2014)).[1]

¶ 34    On February 26, 2019, after this appeal was fully briefed, our supreme court adopted new Illinois Supreme Court Rule 472, which sets forth the procedure in criminal cases for correcting sentencing errors in the "imposition or calculation of fines, fees, assessments, or costs" and "application of *per diem* credit against fines." Ill. S. Ct. R. 472(a)(1), (2) (eff. Mar. 1, 2019). On

---

[1]In light of the Illinois Supreme Court's decision in *People v. Clark*, 2018 IL 122495, defendant withdraws his challenge on appeal to the following charges: the $190 felony complaint filed charge (705 ILCS 105/27.2a(w)(1)(A) (West 2014)), the $2 Public Defender Records Automation Fund charge (55 ILCS 5/3-4012 (West 2014)), the $2 State's Attorney Records Automation Fund charge (*id.* § 4-2002.1(c)), the $15 automation charge (705 ILCS 105/27.3a(1) (West 2014)), and the $15 document storage charge (*id.* § 27.3c(a)). Defendant also withdraws his challenge to the $25 court services charge (55 ILCS 5/5-1103 (West 2014)) in light of our decision in *People v. Brown*, 2017 IL App (1st) 150146, ¶ 39. While defendant's reply brief alleges that he received a $25 automation charge and $25 document storage charge, we note that his initial brief and the fines and fees order both reflect that defendant received $15 charges for each of these two items.

May 17, 2019, Rule 472 was amended to provide that "[i]n all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e) (eff. May 17, 2019). "No appeal may be taken" on the ground of any of the sentencing errors enumerated in the rule unless that alleged error "has first been raised in the circuit court." Ill. S. Ct. R. 472(c) (eff. May 17, 2019). Therefore, pursuant to Rule 472, we "remand to the circuit court to allow [defendant] to file a motion pursuant to this rule," raising the alleged errors regarding fines and fees. Ill. S. Ct. R. 472 (eff. May 17, 2019).

¶ 35    For the foregoing reasons, we affirm Johnson's conviction for aggravated unlawful use of a weapon predicated on not having a FOID card. We remand to the circuit court to allow Johnson to file a motion pursuant to Rule 472.

¶ 36    Affirmed in part; cause remanded.

¶ 37    JUSTICE HYMAN, dissenting:

¶ 38    I do not see how Johnson's flight contributes to any reasonable suspicion that he was engaged in criminal conduct. It was the middle of the night. An unmarked SUV had followed Johnson down an alley. Gangs frequent the area. He did not know who the persons were in the SUV. So Johnson ran away. Officer Salvador even testified that the only reason Johnson jumped on the other police car was to attempt to escape his unknown followers. And, the only justification given for wanting to stop Johnson in the first place was that his hand touched his waistband as he walked. Although we must defer to the trial court's factual finding that the officers reasonably believed Johnson had a weapon, no evidence indicates that he had a gun in his waistband or, if he did, that its possession was illegal. Because there was no reason to think

he was committing a crime, I would find the officers did not conduct a valid *Terry* stop. I respectfully dissent.

¶ 39                    The *Terry* Stop Was Not Justified

¶ 40    The majority relies on the confluence of four facts to uphold Johnson's stop: (i) his late-night presence in a high-crime area, (ii) his "retreat" after seeing officers, (iii) the act of holding his waistband, and (iv) the act of jumping onto the hood of a police car. *Supra* ¶ 16. But, (i) his presence there only can be suspicious if we indulge unseemly assumptions about every resident of "high-crime" neighborhoods, (ii) his "retreat" turns on an overly generous gloss of the record, (iii) holding one's pants at the waist is not evidence of a crime, and (iv) his ending up on the hood of a police car does not amount to suspicion of criminal activity when considered on the totality of the circumstances.

¶ 41                    Johnson's Location

¶ 42    Unique problems are faced by communities presumed to constitute a high-crime area. Presence in a high-crime area is not, on its own, indicative of criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citing *Brown v. Texas*, 443 U.S. 47 (1979)). And yet, according to Salvador's testimony, Johnson's act of "just standing in the alley" in a high-crime area serves as the genesis of this stop. Of course, officers do not need to be suspicious of a person to initiate an encounter with them. See *People v. Luedemann*, 222 Ill. 2d 530, 549 (2006) ("the law clearly provides that a police officer does not violate the fourth amendment merely by approaching a person in public to ask questions if the person is willing to listen"). That said, I am concerned that the level of suspicion attached to "just standing in [an] alley" appears to be neighborhood dependent. See *People v. Leggions*, 382 Ill. App. 3d 1129, 1137 (2008) ("If we deemed such behavior, together with presence in a high-crime neighborhood, to create

- 17 -

reasonable suspicion, we would be giving the police absolute discretion to intrude into the lives of this broad category of innocent travelers simply because they had the misfortune to visit or reside in a high-crime neighborhood."). The officers needed something more; otherwise, every resident in what any law enforcement officer considers a high-crime area could be stopped without any cause whatsoever—simply for walking to a neighbor's house, standing on the sidewalk in front of one's home, or waiting for the bus to work.

¶ 43                                   "Evasive" Behavior

¶ 44    After the officers saw Johnson standing in the alley for about 20 seconds, Salvador saw him "turn into [their] direction" and "grab[ ] onto the front of his waist band and continue[ ] walking briskly eastbound as if to avoid us." It should go without saying that simply walking away from a police officer, even if the purpose is to avoid them, means nothing in the way of suspicion. *People v. Ramsey*, 362 Ill. App. 3d 610, 618 (2005) (just as police have right to approach citizens and speak to them, citizens have right to ignore police and continue on their way (citing *Terry v. Ohio*, 392 U.S. 1, 32-33 (1968) (Harlan, J., concurring))). So, we are left with Salvador's testimony that a person grabbing at their waistband "is a common gesture made for people who are trying to hold onto and conceal a weapon."

¶ 45    At various points in their briefs, the parties seem to have equated "weapon" with "gun," but the evidence does not show as much. Salvador described Johnson as holding a "weapon" or an "object" but never a gun. The carrying of most objects that we think of as weapons becomes criminal only if one also intends to use the weapon unlawfully. *E.g.*, 720 ILCS 5/24-1(a)(2) (West 2014). In other words, mere possession of any number of "weapons" is not illegal. For instance, just carrying an ax on one's hip does not justify suspicion of criminal activity.

¶ 46    In my view, the officers would have needed more specific facts to have reasonable suspicion that Johnson was carrying a weapon that is *per se* illegal (see *id.* § 24-1(a)(1)) or to have reasonable suspicion that Johnson was carrying an otherwise legal weapon in an illegal manner (see, *e.g.*, *id.* § 24-1(a)(9) (forbidding carrying of firearm when "hooded, robed or masked")). Remember, the justification for a *Terry* stop is not that a person is carrying something or doing something that is potentially dangerous; reasonable suspicion requires that a person be engaged in *criminal* activity. See *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009).

¶ 47    Even assuming Salvador's hunch was firearm specific, the Illinois Supreme Court has expanded the second amendment to protect the individual right to the possession of guns outside the home. See *People v. Aguilar*, 2013 IL 112116 (relying, in part, on *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)); see also *People v. Burns*, 2015 IL 117387. The facts do not warrant extended treatment of the issue, but I will note that we have held that officers lacked reasonable suspicion to support a *Terry* stop where the basis for the stop rests entirely on suspicion of simple gun possession. See *People v. Thomas*, 2016 IL App (1st) 141040, ¶ 31 (finding insufficient reasonable suspicion to support *Terry* stop where only information in tip was that defendant seen possessing gun), *appeal denied, judgment vacated in light of People v. Holmes*, 2017 IL 120407. Our supreme court has only disagreed with that analysis for pre-*Aguilar* detentions and arrests, finding they could not be retroactively invalidated even where they are entirely based on suspicion of simple gun possession. *Holmes*, 2017 IL 120407, ¶ 39.

¶ 48    I recognize, as the majority correctly points out, that our supreme court vacated *Thomas* and it is not precedent. I discuss *Thomas* only to point out that it would not be remarkable to find that mere suspicion of gun possession insufficient to establish suspicion of criminal activity; Illinois courts have already held as much. I discuss *Thomas*'s subsequent history only to point

out that the Illinois Supreme Court did not disagree with *Thomas*'s core holding. The overruling of *Thomas* hinged on the defendant's arrest pre-dating *Aguilar*. In cases like this one where an arrest post-dates *Aguilar*, we should take the opportunity to reaffirm *Thomas*'s correct interpretation of the fourth amendment when it confronts the second amendment.

¶ 49    That confrontation has been resolved in other jurisdictions. One of the leading cases on this issue, decided even before *District of Columbia v. Heller*, 554 U.S. 570 (2008), was issued from the Third Circuit. There, the court held that mere possession of a gun is not evidence of criminal activity sufficient to justify a *Terry* stop in a jurisdiction where it "is not necessarily a crime to possess a firearm." *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000). Other jurisdictions have held similarly. See *Northrup v. City of Toledo Police Department*, 785 F.3d 1128, 1131-32 (6th Cir. 2015); *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013); *United States v. King*, 990 F.2d 1552, 1559 (10th Cir. 1993); *Commonwealth v. Hicks*, No. 56 MAP 2017, 2019 WL 2305953, at * 14 (Pa. May 31, 2019) (discussing cases from Massachusetts and Indiana); *State v. Williamson*, 368 S.W.3d 468, 480-81 (Tenn. 2012).

¶ 50    As many of our colleagues in other jurisdictions already have realized, allowing bare possession of a gun to give rise to reasonable suspicion "gives police officers unbridled discretion to decide *which* of those [presumptively] legally armed citizens will be targeted for frisks, implicating concerns about the abuse of police discretion that are fundamental to the Fourth Amendment." (Emphasis in original and internal quotation marks omitted.) *United States v. Robinson*, 846 F.3d 694, 712 (4th Cir. 2017) (Harris, J., dissenting, joined by Gregory, C.J., and Motz and Davis, JJ.); see also *United States v. Williams*, 731 F.3d 678, 694 (7th Cir. 2013) (Hamilton, J., concurring) ("we also need to recognize genuine safety concerns of police officers

and citizens, as well as the potential for intentional or unintentional discrimination based on neighborhood, class, race, or ethnicity").

¶ 51     When the United States Supreme Court applied the protections of the second amendment to the states, we were assured that minority communities would not be subject to disparate scrutiny, at least not on the basis of suspected gun possession. *McDonald v. City of Chicago*, 561 U.S. 742, 790 (2010) (opinion of Alito, J., joined by Roberts, C.J., and Scalia and Kennedy, JJ.) ("the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials"). That promise means nothing if people like Johnson, who had his gun "for protection because [he'd] gotten shot before," are going to be subject to immediate suspicion because they appear to be exercising their second amendment rights in the "wrong" neighborhood, at the "wrong" time of day, or while having the "wrong" color skin.

¶ 52     I find the reasoning in these cases persuasive and would hold that a hunch that a person in possesses a gun, without any evidence suggesting the possession is illegal, cannot serve as reasonable suspicion that the person is committing a crime. So Johnson's act of walking away and grabbing his waistband, even if those actions indicate possession of a gun, did not amount to suspicion of criminal activity.

¶ 53                                    Johnson's "Flight"

¶ 54     Analysis of the remaining facts requires resolution of a glaring factual inconsistency about whether Johnson knew the men in the SUV were police officers. The remainder of the State's argument characterizing Johnson's behavior as suspicious depends on that knowledge. To support its position, the State makes much of its view of the record that there was a marked squad car "exactly behind" the unmarked SUV. The trial court made no express factual finding

about the position of the police cars, other than to find that Johnson "jump[ed] on the hood" of the squad car. Salvador's testimony, however, is troublingly unclear on this point.

¶ 55    Salvador first testified that the officers were west of Johnson when they saw him in the alley. This alone is problematic. Salvador testified that the officers were near 6842 South Paulina Street when they saw Johnson standing in the alley "between Paulina and Hermitage." I take judicial notice that Paulina Street is *east* of Hermitage Avenue. See *People v. Rojas*, 359 Ill. App. 3d 392, 409 n.1 (2005) (taking judicial notice of location of streets); see also *People v. Clark*, 406 Ill. App. 3d 622, 632-33 (2010) (taking judicial notice that a park is north of certain intersection). So right from the outset, Salvador's testimony presents us with a conundrum. If Johnson was in the alley between Paulina Street and Hermitage Avenue, and the officers were on Paulina Street, then they could not have been west of Johnson. Either the officers were not actually near 6842 South Paulina Street as Salvador said they were, or Johnson was not actually in the alley between Paulina Street and Hermitage Avenue as Salvador said he was.

¶ 56    Maybe these inconsistencies could be excused as minor, but there's more. According to Salvador, Johnson started walking "briskly eastbound." The officers in the unmarked SUV followed Johnson as he kept going east. The State emphasizes Salvador's testimony that another "squad car" was "exactly behind" the unmarked SUV, to the "west of [it]." But then, once the officers got out of the unmarked SUV, Salvador said that Johnson "turned to run and flee away from [them] *west*bound." (Emphasis added.) To reconcile this testimony with Salvador's previous testimony, one would have to believe that Johnson attempted to flee by turning around and running towards the people following him (remember, Salvador initially said the unmarked SUV was west of Johnson). But, that cannot be true given Salvador's following testimony: "He attempted to flee westbound *away* from us." (Emphasis added.) When Johnson ran away from

the unmarked SUV, he ran "[i]n the direction of the other vehicle." So unless the squad car was able to make it from behind the unmarked SUV to the other end of the alley in the time it took Johnson to run 15 feet, only two possible conclusions follow: (i) the squad car was not actually behind the unmarked SUV or (ii) the squad car did not actually block Johnson's egress from the alley, meaning he would not have had the opportunity to jump on it as part of his escape.

¶ 57    As the majority points out, we only reverse factual findings made by the trial court if they are against the manifest weight of the evidence. *Supra* ¶ 12 (citing *People v. Close*, 238 Ill. 2d 497, 504 (2010)). The trial court made the express factual finding that Johnson "jump[ed] on the hood of the police car." While I might be inclined to reverse this factual finding given the troubling nature of Salvador's testimony, there is a construction of the facts that allows me to defer to it. I reject the State's position that the squad car was behind the unmarked SUV but accept the trial court's finding that the squad car blocked Johnson's attempted exit from the alley.

¶ 58    It is in this factual context that I next consider Johnson's flight. The State points out, indeed emphasizes, that evidence of flight can support a finding of reasonable suspicion. See *Wardlow*, 528 U.S. 119. The majority cites *Wardlow* as if it stands for the proposition that flight in a high-crime area is *per se* evidence of criminal activity. I strongly disagree. Initially, *Wardlow*'s holding cannot be separated from its facts. Officers were part of a special operations team in a four-car caravan on its way to a drug trafficking area for the express purpose of investigating drug transactions. *Id.* at 121. The officers already expected to find a crowd of people there, including lookouts and customers. *Id.* The officers saw the defendant holding an opaque bag and then saw him run when he looked in the officers' direction. *Id.* at 121-22.

¶ 59    Salvador did not testify that the officers had come to the area to specifically patrol for illicit behavior. The officers were on routine patrol in an unmarked SUV. When the officers first saw Johnson "he was just standing in the alley." And then, when Johnson looked in the direction of the *unmarked* SUV, he did not run, he "continued walking briskly eastbound." As I said before, we have held that people are free to ignore officers and continue on their way, and we should not hold that freedom against the people who exercise it. See *People v. Qurash*, 2017 IL App (1st) 143412, ¶¶ 75-77 (Ellis, P.J., dissenting) (noting the "trick box" we place citizens in by saying that they can walk away from police if that same action will be used against them by characterizing it as criminal).

¶ 60    Significantly, we recently found that a person's flight is *not* indicative of suspicious behavior on facts that get much closer to suspicion than the ones here. In *In re D.L.*, four patrol officers got multiple calls of "shots fired" and responded to the scene. *In re D.L.*, 2017 IL App (1st) 171764, ¶ 4. One minute later and one block away the officers saw the respondent "walking quickly" away from the shots fired call. *Id.* ¶ 5. The officers attempted a street stop, telling respondent that they wanted to have a conversation with him about the shots fired call, and the respondent ran north down an alley. *Id.* ¶¶ 5-6.

¶ 61    This court found that the officers did not have suspicion when they first saw the respondent and observed him for five seconds even though he was walking away from the area of the shots fired call. *Id.* ¶ 21. The court went on to find the officers lacked suspicion "[e]ven considering respondent's flight as part of the totality of the circumstances." *Id.* ¶ 28. The court found "no bright-line rule authorizing the temporary detention of anyone who flees at the mere sight of police," and the court found "no other factors supporting a finding that [the officer] had reasonable suspicion" of criminal activity." *Id.* ¶¶ 28-29. The court expressly rejected the State's

reliance on *Wardlow* finding, as I would here, that no other factor justified reasonable suspicion. *Id.* ¶ 30.

¶ 62    There are even fewer suspicious circumstances with Johnson's detention. Unlike the officers in *In re D.L.*, Salvador and his partners were not in the area responding to a call of a recently committed, dangerous crime. Johnson, quite literally, was standing in an alley. Additionally—and this is critical—unlike *In re D.L.* the officers made no effort to communicate to Johnson who they were or why they were approaching him in an alley in the middle of the night. In *In re D.L.*, the respondent knew he was running from police, and the court still found that his flight was not indicative of criminal behavior. Nothing in this record suggests that when Johnson started "walking briskly," or even when he started running, he knew the men chasing him were police officers.

¶ 63    I am particularly troubled by our tendency to ascribe ill motives to a person's flight, even flight from known police officers, in every circumstance. The court in *In re D.L.* (*id.* ¶ 27) cited Justice Stevens's dissent in *Wardlow* where he predicted: "Among some citizens, particularly minorities and those residing in high-crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence." *Wardlow*, 528 U.S. at 132 (Stevens, J., dissenting, joined by Souter, Ginsburg, and Breyer, JJ.). His view has found its way into majority opinions in other jurisdictions. *E.g.*, *United States v. Brown*, No. 17-30191, 2019 WL 2364504, at *5-6 (9th Cir. June 5, 2019); *Commonwealth v. Warren*, 58 N.E.3d 333, 342 (Mass. 2016) ("where the suspect is a black male stopped by the police on the streets of Boston, the analysis of flight as a factor in the reasonable suspicion calculus cannot be divorced from the findings in a recent Boston Police Department

\*\*\* report documenting a pattern of racial profiling of black males in the city of Boston"). I emphasize that I do not ascribe any racial motives to the police officers here period. I simply wish to highlight that flight may carry perfectly innocent explanations even where a person knows he or she is dealing with police.

¶ 64   Of course, Johnson did not know he was dealing with police. Not only was the SUV unmarked, no one testified that the officers announced their office. So, for all Johnson knew, four unknown men followed him down an alley in their SUV then got out and started chasing him. As Salvador pointed out, this was "an area known for \*\*\* gang activity" and it was almost one in the morning. In my view, it is far from criminal—in fact, it is only natural—to run from a group of strangers chasing you in the middle of the night in an area known for gangs. I would not find Johnson's flight to be indicative of criminal activity.

¶ 65                                  Jumping on the Squad Car

¶ 66   Just as the officers' failure to identify themselves as police informs the analysis of Johnson's flight, so too it informs the analysis of his decision to jump on the squad car. Before proceeding, it is important to be clear: the record does not indicate that the squad car was marked. Salvador just referred to it as a "squad car." Because the description of the second car as a "squad" car implies that it is marked, and it makes no difference to my analysis, I will assume it was marked. Even with that assumption, I would conclude that Johnson's act of jumping on the squad car only indicates possible criminal activity if that fact is considered in isolation.

¶ 67   The majority correctly states the law when it says that a defendant's unusual or erratic behavior can contribute to an officer's reasonable suspicion, but the decision on which it relies for that rule, *People v. Jackson*, 2012 IL App (1st) 103300, is distinguishable. There, the officers were in a marked squad car and got out to talk to the defendant and do a field interview. *Id.* ¶¶ 4-

5. Unprovoked by any of the officer's questions, indeed before they could even ask any, the defendant started speaking incomprehensibly. *Id.* ¶ 48. Then, in direct defiance of the officers' orders to put his hands on the squad car, the defendant repeatedly removed his hands and flailed, pointed, and moved around. *Id.* This court upheld the trial court's determination that this "erratic" behavior contributed to the officers' suspicion. *Id.* ¶ 49.

¶ 68   Salvador's encounter with Johnson differs markedly. Salvador and his partners were in an unmarked car; nothing indicates they announced their office. Johnson had no way of knowing that the men approaching him were police officers, unlike the defendant *Jackson*. Additionally, Johnson's attempt to jump over the squad car did not defy a police order, for example, to "stop." While odd on its own, I would not separate this act from his running from men that he did not know.

¶ 69   In the majority's view, an "effort to cast [Johnson]'s conduct in an innocent light" requires second guessing. *Supra* ¶ 19. I disagree. According to Salvador's uncontradicted testimony, "After a brief foot chase of about 15 feet, the defendant *attempted to make good on his escape*, but the route of the alley was blocked by the squad car, so then he jumped on the hood of the squad car and *attempted to flee*." This evidence does not necessarily show that Johnson simply jumped on the police car because he "had a lot of momentum" but suggests an innocent explanation, which Salvador himself acknowledged. Namely, Johnson jumped on the car in an attempt to flee from four men who he had no reason to believe were police officers.

¶ 70                    The Totality of the Circumstances

¶ 71   The touchstone of the fourth amendment is reasonableness (*People v. Timmsen*, 2016 IL 118181, ¶ 9) and so we must ask ourselves: Would a reasonable person run away from four men, who he did not know, that were chasing him down an alley in the middle of the night in a gang-

infested area? I fail to see any answer but "yes." Is it reasonable for officers, in the middle of the night from an unmarked car, to attempt to stop a man who did no more than walk away from them? I fail to see any answer but "no." We must also view these circumstances in their totality (*id.*), and in light of all the facts considered together, I cannot ascribe a criminal motive to Johnson's decision to jump on a police car in what all agree was an attempt "to make good on his escape." Because officers lacked reasonable suspicion of criminal activity I would find that they unlawfully stopped Johnson.

**No. 1-16-1104**

| | |
|---|---|
| **Cite as:** | *People v. Johnson*, 2019 IL App (1st) 161104 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CR-15164; the Hon. Vincent M. Gaughan, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Rebecca Cohen, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Douglas P. Harvath and Ashlee Cuza, Assistant State's Attorneys, of counsel), for the People. |