2021 IL App (1st) 191630-U

No. 1-19-1630

Order filed December 16, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 CR 2771 |
| | ) | |
| JEREMY CREEKMORE, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Defendant's conviction is affirmed where: (1) defendant was not denied his right to the effective assistance of counsel, and (2) the court did not commit plain error by making incomplete Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) inquiries during jury selection where the evidence was not closely balanced.

¶ 2     Defendant Jeremy Creekmore was convicted of aggravated unlawful use of a weapon

(730 ILCS 5/24-1.6(A)(1) (West 2018)) and sentenced to 54 months' imprisonment in the Illinois

Department of Corrections. Defendant filed a timely notice of appeal on July 22, 2019.

¶ 3     On appeal, defendant claims: (1) that he was denied his right to the effective assistance of counsel based on trial counsel's mishandling of his pretrial motion to suppress evidence; and (2) that the trial court committed plain error by making incomplete Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) inquiries where it failed to determine whether the jury understood and accepted the principle that defendant's failure to testify could not be held against him.

¶ 4     We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2018) and 606 (eff. March 12, 2021), governing criminal appeals.

¶ 5     For the reasons that follow, we affirm.[1]

¶ 6                                         I. BACKGROUND

¶ 7     On March 27, 2019, defendant filed a motion to suppress evidence. The motion alleged that defendant was arrested on February 7, 2018, at or near 243 West Pershing Road in Chicago, without probable cause or a warrant.

¶ 8     On May 2, 2019, the trial court held a hearing on defendant's motion. Defendant called Officer Wojciech Kanski as a witness in support of his motion. Officer Kanski testified that on February 7, 2018, at 10:26 p.m., he arrested defendant at 243 West Pershing Road. At the time, he did not have an arrest warrant or a search warrant for defendant's arrest. Officer Kanski saw defendant standing in the middle of a street where a crowd was fighting.

¶ 9     The State then cross-examined Officer Kanski, who testified that while on duty, he and his partner received a call to go to Pershing Road and Princeton Street, where several people were

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

fighting. At that location, the officers saw a group of 15 to 20 people fighting in the middle of the street and blocking traffic. Defendant walked out from among the group of people and passed within five feet of Officer Kanski's car. Officer Kanski observed defendant holding his waistband.

¶ 10 Officer Kanski exited his vehicle, announced his office, and told defendant to stop. Defendant refused and walked away from Officer Kanski. Officer Kanski described defendant's movement as between a walk and a run. From a distance of about five to ten feet away, Officer Kanski followed defendant to a gas station at 243 West Pershing Road. Officer Kanski never lost sight of defendant, who was holding the right side of his waistband as he hurriedly walked away from Officer Kanski.

¶ 11 Defendant then entered the gas station convenience store, and Officer Kanski followed him inside. Defendant looked at Officer Kanski while he continued to hold the right side of his waistband. Officer Kanski saw a bulge on defendant's waistband. Officer Kanski placed his hands on defendant's waist and felt what appeared to him to be a firearm. Officer Kanski then handcuffed defendant and escorted him out of the store. When they got outside, Officer Kanski recovered the firearm and asked defendant if he had a firearm owner's identification card (FOID) or a concealed carry license (CCL).

¶ 12 Officer Kanski testified that surveillance video taken from inside the convenience store truly and accurately depicted what occurred that evening. The trial court viewed the contents of the video.

¶ 13 On redirect examination, Officer Kanski testified that he saw defendant in the middle of the fighting crowd but did not see defendant actually fighting. The crowd began dispersing when police officers arrived on the scene. Officer Kanski testified defendant "was like kind of walking a fast pace, like kind of skipping, I would say." Officer Kanski followed defendant for a total of

between 10 to 15 seconds. Officer Kanski did not see the bulge in defendant's right pocket until he followed defendant into the convenience store. While defendant held the right side of his waistband, he turned and looked at Officer Kanski. When Officer Kanski reached for defendant's waistband, upon placing his hand on defendant's hand, Officer Kanski felt the handle of a gun.

¶ 14    On recross-examination, Officer Kanski testified that he waited until he was outside the convenience store to recover defendant's gun because there were between five and ten other people inside the store. Based on his experience, retrieving a gun while surrounded by a crowd could result in the crowd fighting with the police. Officer Kanski recovered the weapon outside of the convenience store for his safety and the safety of the other people inside the store.

¶ 15    The parties then argued their respective positions, and the trial court made the following findings:

> "The Court's heard the evidence. I find the testifying officer to be a credible and compelling witness.
>
> He is on patrol. There's a huge melee going on in the middle of the street involving multiple people. The Petitioner, Mr. [Creekmore], happened to be in the middle of the melee.
>
> As soon as the police arrive, everybody seems to [disperse], indicating they knew it was the police that [were] there. The police locked into Mr. [Creekmore], like a laser as opposed to all the people. He made eye contact with him; he's shuffling his waist, appearing as though he's got something that he's hiding; hurriedly going away into the – what he thinks may be the safety of a convenience store.

The police follow him. They watch him again, and they notice something that's in his waist that appears to be suspicious, and he's walking away from the police. They wanted to check it out.

They put hands on his waist and feel a gun, and the officer indicates, in the clearest terms – and I could see from the tape – that there were multiple people inside the convenience store, that it may have been dangerous and impractical to take the gun out, right then and there, in front of all the people. He didn't want to agitate the crowd, he wanted to get away from the crowd of people and do it in private, so he put Mr. [Creekmore] in handcuffs and escorted him out so everything could be done safely.

Looking at all this in its totality, I don't find offense to the Fourth Amendment by what I've heard. The motion is respectfully denied."

¶ 16    Jury selection began on June 18, 2019. As is pertinent to an issue raised on appeal, the trial court instructed the jury:

"Is there anybody here that doesn't understand what I'm talking about when I say it is perfectly okay under the law, under the constitution that the accused don't [*sic*] have to testify, doesn't have to call any witnesses, the burden of proof is strictly on the government, they have to prove beyond a reasonable doubt and the accused does not have a responsibility to prove anything at all in a criminal case? Anyone not understand that please raise your hand? Anybody not accept that as part of the fabric of our country that the accused doesn't have to prove their innocence the burden of proof is strictly on the government, they have to prove guilt beyond a reasonable doubt? If you do not accept that, please raise your hand."

¶ 17    Officer Kanski testified for the State. On February 7, 2018, at 10:25 p.m., Officer Kanski was on duty with his partner, Officer Eric Mateo. Officer Kanski had 13 years' overall experience as a police officer with the Chicago Police Department and five years' experience with the gang crimes unit. Officer Kanski was wearing his "civilian dress uniform," which consisted of civilian clothes and a bulletproof vest. The back of the bulletproof vest bore the word "Police." The left side of the vest bore a Chicago police star and Officer Kanski's name tag. Officer Kanski also wore a duty belt on his waist area. An unzipped jacket partially covered Officer Kanski's vest.

¶ 18    Officers Kanski and Mateo were driving eastbound on Pershing Road when they received a radio call to assist Sergeant John Kennedy with a battery in progress a very short distance away at Pershing Road and Princeton Street. When they reached the fighting scene, Officers Kanski and Mateo observed a crowd of about 20 people fighting in the middle of the street. Traffic, including a bus, was stopped as a result of the fight. Officer Kanski saw defendant in the group of people who were fighting but did not see defendant actually fighting. Defendant began walking away from the melee when Officer Kanski's vehicle stopped at the scene.

¶ 19    Officers Kanski and Mateo were the second unit at the scene. Sergeant Kennedy was already outside of his vehicle and pointed at defendant, who was walking towards Officer Kanski's vehicle. When defendant walked right in front of Officer Kanski's vehicle, Officer Kanski exited the car, identified himself as a police officer, and told defendant to stop so that Officer Kanski could talk to him. Defendant immediately turned away from Officer Kanski, walked in front of the stopped bus, and quickly walked away. Officer Kanski followed defendant from a distance of between 10 to 15 feet. Officer Kanski told defendant to stop so that Officer Kanski could speak with him several times. Defendant continued to walk away.

¶ 20    Officer Kanski followed defendant and observed him grab the right side of his waistband. Officer Kanski described defendant's movement as "he kind of manipulates kind of moves around." Based on his experience, Officer Kanski believed this motion indicated that defendant was trying to conceal a weapon. Officer Kanski told defendant to put up his hands, stop, and not move. Defendant did not follow any of these instructions but walked through the parking lot of the Mobil gas station and entered the convenience store.

¶ 21    When he entered the convenience store defendant stopped in the middle of the store by the counter. Officer Kanski followed defendant inside. About five to ten other people were in the store. As Officer Kanski grabbed defendant he observed a bulge on defendant's right side. Officer Kanski grabbed defendant's hand, which was around the bulge. When Officer Kanski grabbed defendant's hand, he felt the handle of a handgun in his waistband. Officer Kanski then handcuffed defendant to ensure that defendant did not try to grab the gun. Officer Kanski handcuffed defendant because he was concerned for his safety and the safety of the other people inside the store.

¶ 22    While Officer Kanski was detaining defendant, Officer Mateo entered the store. Officer Kanski told Officer Mateo that defendant had a gun. At this point, the two officers removed defendant from the store. Based on his previous experience, Officer Kanski determined that defendant should be removed from the store so that he could retrieve the gun outdoors. Officer Kanski did not want to raise the possibility of the crowd fighting him and Officer Mateo or trying to get the gun.

¶ 23    After the officers took defendant outside, Officer Kanski retrieved the handgun from the right side of defendant's waistband. Defendant was then arrested. Officer Kanski removed ammunition from the magazine and a bullet from the chamber of the handgun.

¶ 24    The gun was shown to the jury and admitted into evidence. The surveillance videotape from inside the convenience store was admitted into evidence and played for the jury.

¶ 25    The parties stipulated that defendant did not have a valid FOID card. It was further stipulated that if called to testify, Officer Mateo would testify that the attendant at the Mobil gas station told Officer Mateo that the cameras outside the gas station were inoperable on February 7, 2018. Officer Mateo would further testify that he inventoried the surveillance video from inside the convenience store. Officer Mateo would also testify that he inventoried the firearm that was recovered from defendant. The handgun was a blue steel semiautomatic .9 millimeter Taurus PT-24/7 with a four-inch barrel and bore serial number TBP 15116. Officer Mateo would also testify that he inventoried bullets taken from the handgun. The State then rested.

¶ 26    In defendant's case-in-chief, the parties stipulated that if called to testify, Investigator Ashley Schuchart would testify that she took photographs of the surveillance cameras at the Mobil gas station and the surrounding area. Investigator Schuchart would testify that Chicago Housing Authority apartments across the street from the gas station had exterior surveillance cameras, as did a restaurant at the southeast corner of Pershing Road and Wells Street. A Chicago Police Department police observation device camera (POD) was located at the southwest corner of Pershing Road and Wentworth Avenue. The parties further stipulated that Investigator Schuchart did not inquire whether these cameras functioned on February 7, 2018. The photographs taken by Investigator Schuchart were admitted into evidence.

¶ 27    Defendant testified on his own behalf. Defendant worked as a machine operator for Arrow Manufacturing Company. On February 27, 2018, he left a children's birthday party in a housing authority complex across the street from the Mobil gas station and was waiting with his cousin for

an Uber.[2] At approximately 10:26 p.m., seven or eight females and possibly one male were standing in front of the housing project when a car passed by. Individuals in the car yelled something to the group standing in front of the building, and after four or five females exited the vehicle, an "all-out brawl" occurred. Defendant did not know anyone on either side of the brawl and was not involved in the fight.

¶ 28     During the fight, an ambulance arrived and provided medical attention to one of the girls, who was being "stomped." The fight was still ongoing at this point. Defendant remained standing in front of the Mobil gas station, waiting for his Uber.

¶ 29     A police car approached, but no one exited it. The crowd took off, running towards the Mobil gas station. Defendant testified that "[i]n the commotion, I took off running. I looked at my cousin, and he said, let's get out of here, so I ran towards the gas station." Defendant's cousin opened the door for defendant to enter the gas station. Defendant identified his cousin on the surveillance video.

¶ 30     Defendant testified that the police were part of the crowd that was running towards the gas station. While defendant was talking to a store attendant, a police officer ran up and grabbed defendant. Defendant asked the officer what was going on. The officer handcuffed him, walked him outside to a marked car, and placed him inside the vehicle.

¶ 31     Defendant did not recall being patted down and denied that the police recovered anything from him. Defendant denied that he had a gun that evening.

---

[2] While the report of proceedings indicates that defense counsel directed defendant's attention to the date of February 27, 2018, it is clear that defendant's testimony was directed to the date of the offense, February 7, 2018.

¶ 32    On cross-examination, defendant admitted that he ran away from the police. Defendant denied that the police officer told defendant to stop. Defendant admitted that he did not have a FOID card or a CCL.

¶ 33    The parties rested. After closing arguments, the court instructed the jury. The jury deliberated for about 40 minutes. The jury found defendant guilty of aggravated unlawful use of a weapon.

¶ 34    Defendant filed a written motion for a new trial. On July 22, 2019, defense counsel informed the court that she mistakenly omitted the court's adverse ruling on the pretrial motion to suppress as a basis for requesting a new trial. The trial court denied both defendant's written motion for a new trial and his oral allegation of pretrial error.

¶ 35    A sentencing hearing followed, after which the trial court sentenced defendant to 54 months' imprisonment in the Illinois Department of Corrections.

¶ 36                                                    II. ANALYSIS

¶ 37    On appeal, defendant raises two claims of error. First, defendant claims that he was denied his right to the effective assistance of counsel based on trial counsel's mishandling of his pretrial motion to suppress evidence. Second, defendant alleges that the trial court committed plain error by making incomplete Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) inquiries where it failed to determine whether the jury understood and accepted the principle that defendant's failure to testify could not be held against him.

¶ 38    With respect to the first claim, the State maintains that defendant cannot establish that he was denied his right to the effective assistance of counsel. With respect to the second claim, the

State concedes that the trial court erred but maintains that such error does not rise to the level of plain error where the evidence was not closely balanced.

¶ 39    For the reasons that follow, we affirm defendant's conviction.

¶ 40    A. Whether Defendant Was Denied His Right to the Effective Assistance of Counsel

Based on His Attorney's Handling of His Motion to Suppress Evidence

¶ 41    Defendant alleges that his attorney was ineffective for relying on the wrong legal theory in seeking the suppression of evidence. Defendant maintains that defense counsel should not have based the motion to suppress on a theory of probable cause but on a theory that the police lacked reasonable suspicion to conduct an investigatory stop and pat-down search pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).

¶ 42    The State responds with a multi-tiered argument. Initially, the State maintains that we need not reach the merits of defendant's claim because it is better suited to collateral proceedings. Next, the State argues that defendant has failed to show that trial counsel performed deficiently. Also, the State contends that defendant cannot establish resulting prejudice where no legal basis existed to find the stop and search to be illegal. We now consider each of the State's responses in turn.

¶ 43          1. The Record is Sufficiently Developed to Permit Review of

Defendant's Ineffective Assistance of Counsel Claim

¶ 44    We begin by declining the State's invitation to forgo review of this claim. Where sufficient facts exist to resolve a claim of ineffective assistance of counsel, we will address it on direct appeal. *People v. Henderson*, 2013 IL 114040, ¶¶ 22, 24. The testimony was sufficiently developed at the hearing on the motion and at trial to enable us to consider defendant's claim that he was denied the effective assistance of counsel.

¶ 45        2. Principles Governing Ineffective Assistance of Counsel Claims

¶ 46    Claims of ineffective assistance of counsel are evaluated under the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). Under *Strickland*, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687; *Albanese*, 104 Ill. 2d at 525. To succeed on an ineffective assistance of counsel claim, a defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. *People v. Snowden*, 2011 IL App (1st) 092117, ¶ 70.

¶ 47    The decision of whether to file a motion to suppress is generally considered a matter of trial strategy that will typically not support a claim of ineffective assistance of counsel. *Id*. For a defendant to establish that he was prejudiced by counsel's failure to file a motion to suppress, he must show a reasonable probability that the motion would have been granted and that the outcome of the trial would have been different if the evidence at issue had been suppressed. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). An attorney's decision not to file a motion to suppress will not be grounds to find incompetent representation when the motion would have been futile. *Id.*

¶ 48        3. Principles Governing Fourth Amendment Claims

¶ 49    The fourth amendment of the United States Constitution and article I, section 6 of the Illinois Constitution of 1970, protect individuals against unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; *People v. Holmes*, 2017 IL 120407, ¶ 25. The " 'essential purpose' of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions." *People v. McDonough*, 239 Ill. 2d 260, 266-67 (2010)

(quoting *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979)). The purpose of the fourth amendment is not to eliminate all contact between the police and citizens but " 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' " *United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)). The fourth amendment does not proscribe all searches and seizures, but only those that are "unreasonable." *People v. Thomas*, 2019 IL App (1st) 162791, ¶ 18.

¶ 50     Review of a motion to suppress involves both questions of fact and law. *People v. Moss*, 217 Ill. 2d 511, 517 (2005). In reviewing a trial court's decision on a motion to suppress involving probable cause or reasonable suspicion, we apply the bifurcated standard set out in *Ornelas v. United States*, 517 U.S. 690 (1996). *Holmes*, 2017 IL 120407, ¶ 9; *People v. Sorenson*, 196 Ill. 2d 425, 430-31 (2011). We give great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *Id*. at 431. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the finding is unreasonable, arbitrary, or not based on the evidence. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). A reviewing court remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions in determining what relief, if any, should be granted. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). We review *de novo* the trial court's ultimate finding with respect to probable cause or reasonable suspicion. *Sorenson*, 196 Ill. 2d at 431.

¶ 51     Police-citizen encounters are divided into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions known as *Terry* stops, which must be supported by reasonable, articulable suspicion of criminal activity; and (3) consensual encounters

that involve no coercion or detention and thus do not implicate constitutional rights. *Luedemann*, 222 Ill. 2d at 554.

¶ 52    In *Terry*, the United States Supreme Court held that a brief, investigatory stop of a suspect does not violate the fourth amendment so long as the totality of the circumstances known to police is sufficient to create an objectively reasonable suspicion that a crime has occurred. *Terry* further held that because it "would appear to be clearly unreasonable to deny the officer the power to take necessary measures *** to neutralize the threat of physical harm" during such a stop, an officer may also search the stopped person for weapons if there is reason to suspect that he might be armed and dangerous. *Terry*, 392 U.S. at 23-24. Under *Terry*, an officer may briefly stop a suspicious person and make reasonable inquiries to confirm or dispel his suspicions when he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Id*. at 30. When the officer can identify specific articulable facts to warrant the stop, those facts, along with rational inferences that flow therefrom, will justify a stop. *People v. Hackett*, 2012 IL 111781, ¶ 20.

¶ 53    A police officer's mere hunch or unparticularized suspicion will not justify a stop. *People v. Timmsen*, 2016 IL 118181, ¶ 9. The stop must also be justified at its inception. *Id*. An objective standard is used to determine whether the facts available to the officer at the time of the stop would warrant a person of reasonable caution to believe that such action was appropriate. *Id*.

¶ 54    The right to frisk does not automatically flow from a valid *Terry* stop. *People v. Galvin*, 127 Ill. 2d 153, 165 (1989). Where " 'nothing in the initial stages of the encounter serves to dispel [the officer's] reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such

persons in an attempt to discover weapons which might be used to assault him.' " *People v. Colyar*, 2013 IL 111835, ¶ 37 (quoting *Terry*, 392 U.S. at 30-31).

¶ 55    When an officer reasonably believes that a suspicious person is armed and dangerous, the officer may conduct a pat-down search for weapons. *Moss*, 217 Ill. 2d at 519. The sole justification for the frisk is the protection of the police and others in the vicinity and not to gather evidence. *People v. Flowers*, 179 Ill. 2d 257, 263 (1997). An objective standard is used to assess the validity of a pat-down search. *Id.* at 264. The reasonableness of the officer's conduct is gauged by determining whether a reasonably prudent person in the same circumstances would believe that the safety of the officer or another person is in danger. *People v. White*, 2020 IL App (1st) 171814, ¶ 22. We may affirm the trial court's ruling on any basis found in the record. *People v. Hopkins*, 235 Ill. 2d 453, 467-68 (2009).

¶ 56    4. Whether Defendant Was Denied His Right to the Effective Assistance of Counsel

¶ 57    We now consider whether defendant has established that he was denied his right to the effective assistance of counsel.

¶ 58            a. Defendant Was Not Denied the Effective Assistance of Counsel

Under the First Prong of *Strickland*

¶ 59 Defendant's motion to suppress alleged that defendant was arrested on February 7, 2018, at or near 243 West Pershing Road, in the absence of probable cause or a warrant for his arrest. The motion sought to suppress: (1) physical evidence discovered directly and indirectly as a result of the arrest and detention; (2) statements, utterances, gestures, and responses by defendant following his arrest; (3) any in-court identification of defendant; (4) witnesses who viewed defendant during detention following the arrest and witnesses discovered as a result of the arrest;

(5) photographs, fingerprints, blood, breath, and any other information procured during the processing of defendant following his arrest; and (6) all other knowledge and direct and indirect fruits of the arrest.

¶ 60    At the hearing on defendant's motion, defense counsel called Officer Kanski as a witness. Officer Kanski testified that on February 7, 2018, at 10:26 p.m., he arrested defendant at 243 West Pershing Road in Chicago. At the time, Officer Kanski did not have an arrest warrant or a search warrant. When Officer Kanski first saw defendant, he was standing in the middle of the street where a crowd was fighting.

¶ 61    Under section 114-12 of the Code of Criminal Procedure of 1963, defendant bore the burden to prove that his search and seizure were unlawful. *People v. Brooks*, 2017 IL 121413, ¶ 22; 725 ILCS 5/114-12(b) (West 2018). To sustain his burden, defendant was required to make a *prima facie* showing that evidence was obtained by an illegal search or seizure. *People v. Gipson*, 203 Ill. 2d 298, 306-07 (2003). The burden then shifted to the State to counter defendant's *prima facie* showing. *People v. Lampitok*, 207 Ill. 2d 231, 239 (2003). The ultimate burden of proof, however, remained with defendant. *Brooks*, 2017 IL 121413, ¶ 22.

¶ 62    The allegations contained in defendant's motion to suppress and defense counsel's advancement of that motion do not establish deficient performance. Defendant's motion to suppress and the initial testimony given by Officer Kanski in support of his motion made a *prima facie* showing under section 114-12. While it is true that the State countered defendant's *prima facie* showing with evidence that showed that Officer Kanski performed a proper investigatory stop, that fact does not negate the sufficiency of defendant's initial *prima facie* showing.

¶ 63    To the extent that defendant believes that trial counsel failed by not rebutting the State's assertion, we disagree. As the State correctly notes, trial counsel employed a strategy that included

vigorous questioning of Officer Kanski. Defense counsel established that Officer Kanski did not witness defendant commit any crime and only saw the bulge in his pocket when he followed defendant inside the convenience store. The strategy employed by defense counsel called into question the reasonableness of Officer Kanski's actions from their inception until the recovery of the gun. Matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing. *People v. Guest*, 166 Ill. 2d 381, 394 (1995).

¶ 64    Defense counsel's argument in support of his motion opposed the State's claim that the stop and search were both justified. Defense counsel argued:

"DEFENSE COUNSEL: Your Honor, in regards to this case, what the officer testified is that he saw my client coming from a large crowd of a group of individuals that were fighting. He testified that he never saw Mr. [Creekmore] fighting.

He then saw Mr. [Creekmore] leaving that group of individuals, most likely because he did not want to get beat up by those group of individuals fighting. But he also stated in testimony that other individuals are also walking away and [dispersing] when the officer arrived on scene.

You saw the video. The officer was wearing plain clothes. Did not have a Chicago Police Officer vest, it did not look like he was dangling his star on his front.

He stated he announced his office, but when there's a large people [*sic*] fighting and my client's coming from that, the most logical reason would be my

- 17 -

client is trying to get away from anyone that might try to hurt or harm him, which is what happened.

Now that subsequent sequence of events is important. He says he sees my client holding his waistband. There is no indicia that my client was wearing a belt, even in the tape. He has a bomber jacket on. A jacket that covers, and is a little – it's not snug, it's a little more loose fitting. You saw that on the video.

The officer testified he never saw a gun, until he felt something, and then recovered it outside the gas station. He never saw a gun when my client was walking away; he never saw a gun when my client was inside the gas station.

He goes in there, immediately puts hands on my client, targeting my client, not the other group of individuals that are walking away. Puts hands on him, and escorts him out with another officer, detaining my client, making my client feel unable to leave or walk away from the situation; thereby arresting my client.

And only until after he's escorted out of the gas station and after the gun is recovered, which could have legally been held by my client, was he then asked about a FOID and CCL.

Your Honor, at this time, I believe my motion should be granted."

¶ 65 Defense counsel's argument broadly alleged that Officer Kanski's actions were unreasonable and that he was not a credible witness. The evidence adduced at the hearing provided the trial court with at least three alternative bases upon which it could have granted defendant relief: (1) defendant was arrested in the absence of probable cause before the police determined whether he legally possessed a firearm; (2) defendant was improperly followed and detained in the

absence of reasonable suspicion of criminal activity; and (3) defendant was illegally searched in the absence of a reasonable belief that defendant was armed and dangerous.

¶ 66 Defendant misplaces reliance on *People v. Bloxton*, 2020 IL App (1st) 181216. In *Bloxton*, the sole basis for defendant's arrest was his possession of a gun. *Id*. The court held that defense counsel provided deficient representation where he failed to claim after the decision in *People v. Aguilar*, 2013 IL 112116, that a defendant's possession of a gun did not independently create probable cause, and defense counsel provided deficient representation where he failed to assert this legal argument that he would have prevailed on as a matter of law. *Id*. ¶ 23.

¶ 67 In this case, unlike in *Bloxton*, there was no "single bullet" legal theory on which defendant could necessarily prevail. Even if we were to agree that defense counsel's theory was only based on the police lacking probable cause to arrest defendant, that strategy was not unreasonable where it proceeded from a theory that defendant was arrested when he was handcuffed before the officers knew that defendant did not have a FOID card or a CCL. "Trial strategies are unsound only when no reasonably effective criminal defense attorney, facing similar circumstances, would pursue such strategies." *People v. O'Neal*, 2021 IL App (4th) 170682, ¶ 71 (quoting *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997)). Here, we find no infirmity in the strategy employed by defense counsel in support of defendant's motion to suppress.

¶ 68 b. Defendant Has Failed to Show Resulting Prejudice

¶ 69 Even if we were to find that trial counsel's strategy failed to challenge the propriety of the stop and search under *Terry*, we would still find that defendant was not denied the effective assistance of counsel because he has failed to demonstrate resulting prejudice. We consider the circumstances facing Officer Kanski in their totality. *In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 97. In so doing, we find that valid justification existed to both stop defendant and to conduct a

pat-down search. Our conclusion is based on the testimony from the hearing on the motion to suppress and the testimony adduced at trial. *Hopkins*, 235 Ill. 2d at 47.

¶ 70    Upon arriving at the scene of the melee in response to Sergeant Kennedy's call for assistance, Officer Kanski saw a group of between 15 and 20 people fighting in the middle of the street and blocking traffic. The melee impeded traffic to the extent that a bus was brought to a standstill. While Officer Kanski did not actually observe defendant strike anyone, defendant was in the midst of the fight. The fight was sufficiently serious by defendant's own account that an ambulance was called to the scene to assist an injured girl who was being "stomped."

¶ 71    When the police arrived on the scene, the crowd, including defendant, rapidly dispersed. Defendant walked in front of Officer Kanski's car. In response to Sergeant Kennedy pointing in defendant's direction, when defendant walked in front of his vehicle, Officer Kanski attempted to stop defendant to question him. According to Officer Kanski, after he announced his office and asked defendant to stop to speak with him, defendant ignored the officer's request and walked away at a fast pace. According to defendant, no officer ever asked him to stop.

¶ 72    Officer Kanski's unheeded requests did not result in a seizure. An individual is not seized for purposes of the fourth amendment when he does not submit to the officer's show of authority. *California v. Hodari D.*, 499 U.S. 621, 625-26 (1991); *People v. Thomas*, 198 Ill. 2d 103, 112 (2001); *People v. Webb*, 2020 IL App (1st) 180110, ¶ 20; *People v. McMichaels*, 2019 IL App (1st) 163053, ¶ 17.

¶ 73    Officer Kanski continued following defendant to the Mobil gas station. Officer Kanski saw defendant holding the right side of his waistband and moving it around. Based on the totality of his observations and his experience as a seasoned police officer, Officer Kanski could reasonably believe that defendant's movements suggested that he was concealing a weapon.

¶ 74    Then, after following defendant into the convenience store, Officer Kanski made eye contact with defendant, who was still holding the right side of his waistband. As Officer Kanski grabbed defendant, he observed a bulge at defendant's waistband. Defendant's hand was holding the bulge.

¶ 75    When Officer Kanski grabbed defendant's hand, he felt the handle of a gun. Out of an abundance of caution for his safety and the safety of the people inside the store, Officer Kanski did not recover the gun from defendant while they were inside the store. Based on his previous experience, Officer Kanski believed that recovering a gun while surrounded by a crowd could provoke a fight between the police and the crowd.

¶ 76    Officer Mateo entered the convenience store after Officer Kanski. Officer Kanski told Officer Mateo that defendant had a gun. Officer Kanski handcuffed defendant and escorted him out of the store. As he escorted defendant out of the store, Officer Kanski held the handle of the gun, which he retrieved when they got outside. Defendant was arrested.

¶ 77    Our review of the evidence leaves no question that a targeted strategy based on *Terry* alone would not have succeeded where the evidence establishes that both the stop and the pat-down search were proper. *People v. Lee*, 2018 IL App (3d) 160100, ¶ 21.

¶ 78    We find defendant's reliance on *In re Rafeal E.*, 2014 IL App (1st) 133027, *People v. Sims*, 2014 IL App (1st) 121306, and *In re D.L.*, 2017 IL App (1st) 171764, to be misplaced where they are all factually inapposite.

¶ 79    In *Rafeal E.*, the arresting officer testified that while patrolling a "high narcotics location" at 10 a.m., he saw the respondent standing and talking at the mouth of an alley with between four and six other individuals. *Rafeal E.*, 2014 IL App (1st) 133027, ¶ 5. When the officer approached the respondent, he briskly walked away with his hands in his pockets. *Id.* ¶ 6. The officer then

drove up to the respondent and asked him to stop. *Id.* When the respondent complied with the officer's request, the officer asked the respondent to remove his hands from his pockets "for officer safety." *Id*. The respondent raised his hands, and the officer observed a plastic bag that he believed to contain narcotics protruding from the respondent's waistband. *Id.*

¶ 80    In reviewing the propriety of the trial court's denial of the defendant's motion to suppress, the court rejected the State's reliance on *Illinois v. Wardlow*, 528 U.S. 119 (2000), to justify the stop. *Rafeal E.*, 2014 IL App (1st) 133027, ¶ 29. The court held that acceptance of the State's position required the court to "extend *Wardlow* (1) from headlong running to briskly walking; (2) from running down an alley to walking away from an alley and toward an open and exposed sidewalk; and (3) from heading away from police vehicles to heading away from a group of five to six individuals." *Id.*

¶ 81    We need not extend *Wardlow* to conclude that defendant cannot establish prejudice in this case. This case began with a crime being committed in the presence of police officers. Defendant's presence, his quick departure from the scene in response to police presence, and subsequent actions justified the police conducting an investigatory stop.

¶ 82    In *Sims*, while investigating an unrelated incident, the arresting officer observed the defendant sitting in front of what appeared to be an abandoned building. *Sims*, 2014 IL App (1st) 121306, ¶ 4. The officer, who had previously arrested the defendant, saw him stuff an unknown object into his crotch area and begin to walk away. *Id*. Believing the defendant's movement to be consistent with him being potentially armed, the officer conducted a search which resulted in the recovery of plastic bags that contained drugs. *Id.*

¶ 83    Based on the foregoing, the appellate court found that the officer lacked a reasonable suspicion that the defendant was committing the crime of unlawful use of a weapon. *Id*. ¶ 13.

While the officer may have had a "gut feeling," reasonable suspicion required more than a hunch or an assumption. *Id*. ¶ 15. The appellate court concluded that the trial court erroneously denied the defendant's motion to suppress the recovered evidence and reversed the defendant's conviction and sentence outright. *Id*. ¶ 19.

¶ 84 Here, Officer Kanski did not detain defendant until he possessed reasonable suspicion to believe criminal activity was afoot and only conducted a pat-down search when he reasonably believed defendant was both armed and dangerous.

¶ 85 In *D.L.*, the State appealed from the trial court's order granting the respondent's motion to suppress evidence. Upon receiving a call of "multiple shots fired," the officers arrived at the scene, where they saw the respondent and another male quickly walking away from the area. *D.L.*, 2017 IL App (1st) 171764, ¶¶ 4-5. The officers approached the two males and ordered them to stop, but the respondent ran away down an alley in response. *Id*. ¶ 6. One of the officers pursued the defendant and ultimately stopped him and recovered a gun from his jacket. *Id*. ¶ 8.

¶ 86 After hearing these facts, the trial court granted the defendant's motion to suppress, finding that the officer attempted to stop the respondent solely based on seeing him walk away from the direction of the shots fired, "which is perfectly normal for any individual to do." *Id*. ¶ 12. The appellate court agreed with the trial court's assessment, finding that the defendant's flight was insufficient to justify a *Terry* stop. *Id*. ¶¶ 28-31.[3]

---

[3]In *People v. Eyler*, 2019 IL App (4th) 170064, ¶ 53, the court questioned the conclusion reached in *D.L.*, suggesting that such opinion arguably conflicted with our supreme court's holding in *People v. Thomas*, 198 Ill. 2d 103, 113 (2001), *i.e.*, that "[u]nprovoked flight in the face of a potential encounter with the police may raise enough suspicion to justifying the ensuing pursuit and investigatory stop."

¶ 87    In contrast to the facts presented in *D.L*, in this case, Officer Kanski's actions did not result from an anonymous call of a shooting but from a call to assist in an active fight that was actually occurring in Officer Kanski's presence. Officer Kanski did not follow defendant simply because he walked away from him. Officer Kanski followed defendant after seeing him in the middle of the melee and based on defendant's subsequent actions after he walked in front of Officer Kanski's vehicle.

¶ 88    Our decision finds support in *People v. Spain*, 2019 IL App (1st) 163184 and *People v. Webb*, 2020 IL App (1st) 180110. In *Spain*, the defendant challenged the trial court's denial of his motion to suppress evidence. *Spain*, 2019 IL App (1st) 163184, ¶ 20. The appellate court began by noting that while the focus of the parties in the trial court was on whether probable cause existed to arrest the defendant, the issue on appeal concerned whether reasonable suspicion justified the initial stop. *Id*. The court determined that a *Terry* stop was justified based on the following facts: (1) the police responded to an anonymous call that multiple gang members were planning to meet at a specific address to shoot a rival gang member; (2) the officers saw a group of six men in an abandoned building at the building next door; (3) the officers saw what appeared to be a gun handle sticking out of the waistband of the defendant's pants; and (4) the defendant turned from the officer toward a fence and tried to stuff a large black object down his pants. *Id*. ¶ 33.

¶ 89    The court also found that probable cause arose even though the police did not ask whether the defendant had a CCL. *Id*. ¶ 38. The defendant's nervous actions and repeated attempts to put his hands inside his pockets did not indicate legal gun ownership. *Id.*

¶ 90    In *Webb*, while on patrol, police officers saw a group of 30 to 40 people gathered in the street and on the sidewalk and making a lot of noise. *Webb*, 2020 IL App (1st) 180110, ¶ 3. With the officers' arrival, the crowd dispersed, and the defendant began running toward the officers

while clutching something near his waistband. *Id.* ¶ 4. When the arresting officer announced his office and told the defendant to stop, the defendant ignored the request. *Id*. ¶ 4. The officer gave chase and placed his hands on the defendant's shoulders in an attempt to stop him. *Id.* ¶ 5. The defendant resisted, after which the officer performed an "emergency takedown." *Id*. Eventually, the officer recovered a gun from the defendant's waistband. *Id.*

¶ 91 Based on these facts, the appellate court determined that the officers had a reasonable suspicion that the defendant was engaged in criminal activity when he ran from the crowd and grabbed his waist in a manner that suggested that he was carrying a weapon. *Id*. ¶ 16. The defendant's fixation on his waistband suggested that he had a concealed weapon. *Id.* When the defendant failed to comply with the officers' attempts to perform a *Terry* stop, no fourth amendment violation occurred due to them tackling and forcibly restraining him. *Id*. ¶ 20.

¶ 92 We further disagree with defendant's assertion that Officer Kanski did not reasonably believe that defendant was armed and dangerous such that the pat-down search was valid under *Terry*. While *Aguilar* prohibits an individual from being convicted of merely possessing an uncased, loaded, and immediately accessible concealed weapon (*Aguilar*, 2013 IL 112116), such possession remains unlawful if the individual does not have a valid CCL. *Spain*, 2019 IL App (1st) 163184 ¶ 28. A defendant's actions may provide police officers with reasonable suspicion that the defendant does not lawfully possess a firearm. *People v. Gomez*, 2018 IL App (1st) 150605, ¶ 30.

¶ 93 Here, Officer Kanski had ample basis to perform a pat-down search where he had a reasonable belief that defendant was armed and dangerous and did not lawfully possess the firearm. A reasonably cautious individual would have believed that a pat-down search was appropriate under these circumstances. *Colyar*, 2013 IL 111835, ¶ 40.

¶ 94 In considering defendant's claim, we note that the trial court specifically found Officer Kanski to be a "credible and compelling" witness. As has been previously discussed, we yield to those findings of fact unless they are shown to be manifestly erroneous. *Sorenson*, 196 Ill. 2d at 430-31. We perceive no error in the trial court's factual findings.

¶ 95 Our conclusion that Officer Kanski could reasonably believe that defendant was armed and presently dangerous finds support in *People v. Johnson*, 2019 IL App (1st) 161104 and *People v. Salgado*, 2019 IL App (1st) 171377.

¶ 96 In *Johnson*, three officers were driving an unmarked car in an area known for high narcotic and gang activity when they saw the defendant standing in the middle of an alley. *Johnson*, 2019 IL App (1st) 161104, ¶ 3. The defendant turned to face the officers, looked at them, grabbed the front of his waistband, and continued walking briskly away from them. *Id*. When the officers attempted to perform a *Terry* stop, the defendant turned and ran, holding onto his waistband, and jumped onto the hood of a police squad car. *Id*. The officers conducted a protective pat-down search and recovered a loaded semiautomatic handgun. *Id.*

¶ 97 The appellate court affirmed the trial court's denial of the defendant's motion to suppress evidence finding that the evidence gave rise to a reasonable articulable suspicion of criminal activity. *Id*. ¶ 16. The court rejected the defendant's claim that his actions were lawful and that carrying a concealed weapon is not *per se* unlawful, noting that even innocent behavior may provide reasonable suspicion for a *Terry* stop. *Id*. ¶ 17 (quoting *People v. Timmsen*, 2016 IL 118181, ¶ 44). The court noted that the dissent improperly relied on *People v. Thomas*, 2016 IL App (1st) 141040, ¶ 31, for the proposition that officers may not conduct a *Terry* stop based solely on an officer suspecting an individual of possessing a gun, where our supreme court vacated that opinion. *Id*. ¶ 18.

¶ 98    In *Salgado*, the facts established that in response to retaliatory shootings in the area of the 3800 block of West 30th Street, a police sergeant was patrolling the area in an unmarked squad car. *Salgado*, 2019 IL App (1st) 171377, ¶ 3. The sergeant saw two males walking on the sidewalk, and after making eye contact with one of them, they immediately separated and walked off in different directions. *Id*. The sergeant then observed the defendant adjusting and grabbing at something in his waistband. *Id*. ¶¶ 3-4. The sergeant exited his vehicle, approached the defendant, and asked him whether he had any weapons in his possession. *Id*. ¶ 5. When the defendant replied "no" and continued walking, the sergeant asked the defendant to lift up his t-shirt. *Id*. The defendant replied, "I don't have to," while continuing to grab the object in his waistband. *Id*. The sergeant placed his hand on the object that the defendant was holding and recovered a loaded handgun. *Id.*

¶ 99    In reviewing the trial court's denial of the defendant's motion to suppress, the court began by noting that the sergeant's act of exiting his vehicle "was a nonevent" insofar as the fourth amendment was concerned. *Id*. ¶ 19. In considering the propriety of the stop, the court found that the defendant's mere presence in what was established to be a high-crime area would not, by itself, justify a *Terry* stop. *Id*. ¶ 26. The stop, however, was not based on mere presence but on the defendant walking away upon making eye contact with the sergeant and his repeated movements towards the right side of his waistband. The totality of the circumstances gave rise to a reasonable suspicion that criminal activity was afoot. *Id*. ¶ 32. The court further rejected the defendant's claim that the sergeant's actions were not justified because a *Terry* stop can no longer rest on a gun's possible observation alone. *Id*. ¶ 33. The court noted that reasonable suspicion was not based on the sergeant's possible observation of a gun alone but the defendant's conduct. *Id*.

¶ 100 Furthermore, the court noted the defendant's misplaced reliance on *People v. Horton*, 2017 IL App (1st) 142019, where such opinion was vacated by our supreme court, making that decision void and without legal effect under *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 116. *Salgado*, 2019 IL App (1st) 171377, ¶ 33.

¶ 101 *Johnson* and *Salgado* support our conclusion that defendant has failed to establish prejudice under the second prong of *Strickland,* where he would not have prevailed on a theory that Officer Kanski lacked a legal basis for conducting a pat-down search. Officer Kanski's actions were justified where he reasonably believed that defendant was in illegal possession of a gun. Officer Kanski's pat-down search was not based on defendant's mere possession of a gun but on the totality of the circumstances known to him at the time. In viewing Officer Kanski's conduct objectively, we believe his actions were reasonable under the fourth amendment.

¶ 102 Neither *Horton* nor *People v. Thomas*, 2016 IL App (1st) 141040, undermine our conclusion that Officer Kanski's actions were justified. As was recognized in *People v. Balark*, 2019 IL App (1st) 171626, ¶ 80, both judgments were vacated by our supreme court.

¶ 103 In conclusion, we reject defendant's ineffective assistance of counsel claim where he has failed to establish either that his attorney's performance was deficient or that he suffered any resulting prejudice based on such performance.

¶ 104                    B. Defendant's 431(b) Claim

¶ 105 Defendant also alleges that the trial court committed plain error by making incomplete Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) inquiries where it failed to determine whether the jury understood and accepted the principle that defendant's failure to testify could not be held against him.

¶ 106    The State concedes that the express requirements of Rule 431(b) were not followed where the trial court failed to properly admonish the jury that defendant's failure to testify could not be held against him. However, the State maintains that this claim was forfeited where not raised at trial, *People v. Enoch*, 122 Ill. 2d 176, 186 (1988), and that defendant has failed to show that the evidence was closely balanced. We agree.

¶ 107    Our review of this claim is *de novo. People v. Peters*, 2011 IL App (1st) 092839, ¶ 28. Rule 431(b) states:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section."

Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 108    In *People v. Thompson*, 238 Ill. 2d 598, 607 (2010), our supreme court held that the language of Rule 431(b) clearly and unambiguously requires the trial court to ask the prospective jurors whether they understand *and* accept the four principles outlined in the rule.

¶ 109 Here, the parties agree that the trial court failed to properly question the prospective jurors about the fourth principle under Rule 431 and that defendant failed to raise this contention of error in the trial court. As such, the parties also agree that defendant bears the burden of demonstrating that the evidence was closely balanced such that the error tipped the scales of justice against him. *Thompson*, 238 Ill. 2d at 611.

¶ 110 In determining whether the evidence produced at trial was closely balanced, we conduct a qualitative commonsense assessment of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 53. In *People v. Naylor*, 229 Ill. 2d 584, 609 (2008), the majority rejected the dissent's suggestion that it was creating "a rule holding that if the evidence at trial involves a contest of credibility, and the defendant testifies contrary to the prosecution's witnesses, the evidence will always be closely balanced." *Id.* at 615-16 (Thomas, C.J., dissenting, joined by Garman and Karmeier, JJ.) As the court explained: "It is axiomatic that whether the evidence in a criminal trial is closely balanced depends solely on the evidence adduced in that particular case." *Id.*

¶ 111 Here, the State's version of events was at odds with defendant's version. However, both the State's version and defendant's version were not consistent with the physical evidence. Officer Kanski testified that he recovered a gun from defendant. The parties stipulated that if called to testify, Officer Mateo would testify that he inventoried the recovered firearm retrieved from defendant. The handgun was a blue steel semiautomatic .9 millimeter Taurus PT-24/7 with a four-inch barrel and bore serial number TBP 15116. Additionally, the events that transpired inside the convenience store were recorded on a video camera, shown to the jury, and admitted into evidence.

¶ 112 In stark contrast, defendant claimed that he was not told to stop, was not patted down, and did not possess a gun the night he was arrested. Defendant's version of events strained credulity.

The jury returned a verdict in 40 minutes. The evidence, in this case, was decidedly not closely balanced.

¶ 113   Finally, we are hard-pressed to imagine how this error could have affected the outcome of defendant's trial where defendant testified. To prevail on the first prong of plain error, a defendant must prove "prejudicial error." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

¶ 114   In *People v. White*, 407 Ill. App. 3d 224, 230 (2011), the trial court failed to ascertain whether the jury understood and accepted the fourth principle under Rule 431(b); that a defendant does not have to testify and that his decision not to do so cannot be held against him. The appellate court found that the defendant failed to establish first-prong plain error. *Id.* at 231. The court found that the defendant did not establish that the error alone could have led to his conviction, where:

> "[e]ven if the evidence was closely balanced, the trial court's failure to inquire whether the potential jurors understood defendant's right not to testify was of no consequence since defendant testified at trial and the trial court instructed the potential jurors of defendant's right not to testify. No plain error occurred under the first prong of review." *Id*.

¶ 115   As in *White*, while the trial court, in this case, failed to ascertain whether the jurors understood and agreed with the principle that the jury could not draw an adverse conclusion from defendant's failure to testify, the court did inform the jury that defendant had that right and defendant did testify at trial.

¶ 116   For the foregoing reasons, we find that defendant has failed to establish that the trial court committed plain error by making incomplete inquiries under Illinois Supreme Court Rule 431(b).

¶ 117                                    III. CONCLUSION

¶ 118   The judgment of the circuit court is affirmed.

¶ 119   Affirmed.